# EXHIBIT B

| | |
|---|---|
| **DISTRICT COURT, DENVER COUNTY, STATE OF COLORADO**<br><br>Address: 1437 Bannock Street, Room 256<br>Denver, CO 80202 | DATE FILED: January 15, 2019 2:52 PM<br>FILING ID: A689DB6244A3E<br>CASE NUMBER: 2019CV30165<br><br>▲ **COURT USE ONLY** ▲ |
| **Plaintiffs:** DC AUTOMOTIVE, INC. d/b/a ARAPAHOE KIA, a Colorado Corporation and SLT GROUP VI, INC. d/b/a PEAK KIA, a Colorado corporation<br><br>v.<br><br>**Defendant:** KIA MOTORS AMERICA, INC., a California corporation. | Case Number<br><br>_____<br><br>Division _____ |
| **Attorneys for Plaintiffs:**<br>Craig D. Joyce, Atty. Reg. No. 10556<br>Michael J. Dommermuth, Atty. Reg. No. 14830<br>Adrian P. Castro, Atty. Reg. No. 42028<br>Fairfield and Woods, P.C.<br>1801 California Street, Suite 2600<br>Denver, CO 80202<br>Telephone: (303) 830-2400<br>Facsimile: (303) 830-1033<br>E-Mail: mdommermuth@fwlaw.com<br>E-Mail: cjoyce@fwlaw.com<br>E-Mail: acastro@fwlaw.com | |
| **COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** | |

DC Automotive, Inc. d/b/a Arapahoe Kia ("Arapahoe Kia") and SLT Group VI, Inc. d/b/a Peak Kia ("Peak Kia"), by and through their counsel, Fairfield and Woods, P.C., pursuant to C.R.S. § 44-20-125, submit this Complaint for Injunctive Relief and Damages ("Complaint") to prevent the Defendant, Kia Motors America, Inc. ("KMA"), from establishing a new Kia dealership in close proximity to their existing dealerships and for an award of damages. In support of this Complaint, Arapahoe Kia and Peak Kia respectively show the court as follows:

## NATURE OF THE ACTION

1. Plaintiffs, Kia dealers, are entitled to redress for Defendant KMA's wrongful decision to establish a new Kia dealership less than ten miles from Plaintiffs' dealerships. KMA's decision violates the Colorado statute regulating the operation of automobile manufacturers and their distributors, as well as the parties' agreements. If upheld by this Court, KMA's decision would inflict harm on Plaintiffs' businesses and unfairly deprive them of the

benefits they legitimately earned in promoting KMA's brand and products by making multi-million dollar investments in their businesses, facilities, reputation, and goodwill over a significant number of years.

## PARTIES

2. Arapahoe Kia, a Colorado corporation, is licensed as a Motor Vehicle Dealer as defined by C.R.S. § 44-20-102(18).

3. Peak Kia, a Colorado corporation, is licensed as a Motor Vehicle Dealer as defined by C.R.S. § 44-20-102(18).

4. KMA, a California corporation, is licensed as a motor vehicle Distributor in Colorado as defined by C.R.S. § 44-20-102(9). KMA is authorized to transact business as a foreign corporation in Colorado.

5. KMA is a wholly owned subsidiary of the South Korean manufacturer of Kia vehicles.

## JURISDICTION AND VENUE

6. This Court has subject matter by virtue of article VI, section 9 of the Colorado Constitution, and C.R.S. § 44-20-125(5)(a).

7. Venue is proper in Denver County because Peak Kia is located in Denver County and per C.R.S. § 44-20-132(1)(a) "venue shall be proper in the county or judicial district where the dealer resides or has its principal place of business."

## GENERAL ALLEGATIONS

### The Relationship Between the Parties

8. KMA is the North American distributor and manufacturer representative for the Kia line of vehicles.

9. Arapahoe Kia operates a Kia dealership pursuant to a Franchise as defined by C.R.S. § 44-20-102(11). Arapahoe Kia has operated its dealership since November of 2008.

10. Peak Kia operates a Kia dealership pursuant to a Franchise as defined by C.R.S. § 44-20-102(11). Peak Kia has operated its dealership since 2003.

11. Arapahoe Kia and Peak Kia each have a Sales and Service Agreement with KMA as defined by C.R.S. § 44-20-102(24). A copy of KMA's Sales and Service Agreement is attached hereto as **Exhibit A**.

-2-

12. The Sales and Service Agreement entered into between KMA and each respective dealer states that each "DEALER enters into this Agreement in reliance upon COMPANY's integrity, expressed intention to deal fairly with DEALER and the consuming public, and promises to adhere to the terms and conditions herein." *See* Exhibit A, Introduction.

13. The Sales and Service Agreement also provides that "the parties to this Agreement acknowledge that the success of the relation between COMPANY and DEALER depends upon mutual understanding, cooperation, trust and confidence of both COMPANY and DEALER." *See* Exhibit A, Introduction.

14. KMA drafted the Sales and Service Agreement in its entirety.

15. Neither Arapahoe Kia nor Peak Kia have meaningful bargaining power with KMA. KMA does not entertain any negotiations with dealers on the terms and conditions set forth in the Sales and Service Agreement. The Sales and Service Agreement is a contract of adhesion offered on a "take it or leave it" basis.

16. Pursuant to the terms of the Sales and Service Agreement, Arapahoe Kia and Peak Kia have each independently invested millions of dollars in developing and maintaining their Kia dealerships for the combined benefit of KMA and their respective businesses.

17. Pursuant to the terms of the Sales and Service Agreement, Arapahoe Kia and Peak Kia each employ teams of skilled and experienced professionals, including sales consultants, financial experts, service advisors, and automotive technicians, as required by KMA as part of the contract between the parties. Peak Kia employs approximately 56 persons and Arapahoe Kia employs approximately 45 persons.

18. Training expenses alone amount to tens of thousands of dollars a year for each dealership. In 2016, 2017, and 2018, both dealerships met KMA's minimum training standards for their employees.

19. Pursuant to the terms of the Sales and Service Agreement, Arapahoe Kia and Peak Kia each maintain Kia signage as is necessary to satisfy KMA's signage standards and promote the Kia brand.

20. Since the establishment of their franchises, Arapahoe Kia and Peak Kia have worked to develop their reputations, customer bases, and goodwill for themselves and the Kia brand in metropolitan Denver market.

21. From time to time, KMA undertakes to study dealer markets for ensuring that the dealer's assigned geographic territory known as the "Area of Primary Responsibility" is assigned properly.

22. KMA assigns its dealers' Areas of Primary Responsibility using geographic boundaries based on census tracts developed by the United States Census Bureau.

23. KMA's general policy is for all census tracts to be assigned to a Kia dealer. The assignment of census tracts is based upon the analysis of which Kia dealership is closest and most convenient to the assigned group of census tracts.

24. KMA uses Areas of Primary Responsibility for measuring sales performance and assigning sales incentive objectives.

25. KMA has various sales incentive programs in effect at any point in time, which represent a significant portion of the revenue earned by authorized Kia dealers, including plaintiffs.

26. In the Sales and Service Agreement, KMA unilaterally grants itself discretion to alter or adjust the Area of Primary Responsibility assigned to a dealer.

27. Arapahoe Kia's and Peak Kia's Areas of Primary Responsibility are determined solely by KMA without negotiation.

28. However, KMA may only add new dealers into the area of primary responsibility assigned to a Dealer as permitted by applicable law. Exhibit A, ¶ IX(B)(1).

29. In practice, the geographic area from which Arapahoe Kia and Peak draw their customer base is broader than their respective Areas of Primary Responsibility. For example, a market report for Arapahoe Kia prepared by R.L. Polk & Co. reported that as of October 2018, only 45% of Arapahoe Kia's sales were to purchasers within its Area of Primary Responsibility. Similarly, a significant percentage of Peak Kia's sales are to purchasers outside of its Area of Primary Responsibility.

### KMA's Decision to Open a New Competing Dealership

30. On October 19, 2018, KMA submitted letters to Arapahoe Kia and Peak Kia notifying those dealerships of its intent to appoint a new Kia dealer ("Proposed Dealership") at 1260 S. Colorado Blvd., Denver, Colorado. The letter correctly identified Arapahoe Kia and Peak Kia as being within the Relevant Market Area as defined in C.R.S. § 44-20-125(4)(b) of the Proposed Dealership. A copy of KMA's notice letter to Arapahoe Kia is attached hereto as **Exhibit B**.

31. The Proposed Dealership will be in direct competition with Arapahoe Kia and Peak Kia.

32. Both Arapahoe Kia and Peak Kia make substantial sales to current and Kia customers who live or work in the geographic area proximate to the Proposed Dealership. For example, Peak Kia concluded approximately 1,300 sales in 2017 and 2018 to purchasers in postal zip codes within 10 miles of the Proposed Dealership.

33. Arapahoe Kia and Peak Kia currently provide maintenance and repair service to Kia customers not only in their assigned Areas of Primary Responsibility but also in the area Kia intends to assign to the Proposed Dealership. For example, Peak Kia performed approximately 3,800 vehicle service transactions in 2017 and 2018 to consumers in postal zip codes within 10 miles of the Proposed Dealership.

34. The Proposed Dealership is 5.2 miles from Arapahoe Kia and 9.8 miles from Peak Kia.

35. Arapahoe Kia and Peak Kia are within the "Relevant Market Area" of the Proposed Dealership as defined in C.R.S. § 44-20-125(4)(b).

36. Arapahoe Kia formerly operated its Kia Dealership at 9400 E. Arapahoe Road, Greenwood Village, Colorado 80112. The facility at 9400 E. Arapahoe Road exceeded KMA facility size requirements and allowed Arapahoe Kia to adequately represent KMA at that location.

37. In November 2013, KMA sent a letter to Arapahoe Kia purporting to terminate Arapahoe Kia as a Kia Dealer. KMA alleged in part that Arapahoe Kia was failing to maintain adequate facilities to represent KMA in the market.

38. Arapahoe Kia formally protested KMA's attempted termination. In order to appease KMA and settle the termination case, Arapahoe Kia agreed to move its dealership to its present location 9701 E. Arapahoe Road, Centennial, Colorado 80112.

39. Arapahoe Kia spent additional millions of dollars in order to relocate its dealership to the new facility. Arapahoe Kia met KMA's strict architectural guidelines and facility requirements in relocating to the new facility. Arapahoe Kia spent over $11 million to build this facility, which was the first Kia Gallery dealership in the Denver metro area. Arapahoe Kia spent another approximately $1.5 million for equipment, furniture, fixtures and signs for the new Kia Gallery dealership.

40. Peak Kia has expended millions of dollars to build and maintain a Kia facility that complies with KMA's rigorous facility standards and represents KMA in the Denver market.

41. Arapahoe Kia and Peak Kia are adequately representing KMA in the Relevant Market Area, both in sales and service. Both dealers have generated millions in sales of Kia products over the past three years, with sales revenue increasing year after year from 2016 forward. Moreover, both dealers have sufficiently and adequately served their customers since their inception.

42. For example, in 2017 and 2018 both dealerships were within or above the national average within Kia's customer service indexes and Kia's service index.

43.     Due to Arapahoe Kia's sales and marketing efforts, in 2018 KMA's market share increased in Arapahoe Kia's Area of Primary Responsibility.

44.     As another example, in 2018 both dealerships sold over $1 million worth of parts and accessories, with Peak Kia selling approximately $3.3 million in parts and accessories, and Arapahoe Kia selling $1.1 million. For both dealerships, this was a significant increase from their previous year.

45.     Arapahoe Kia and Peak Kia on a yearly basis spend hundreds of thousands of dollars advertising Kia products and promoting the Kia brand in their respective areas, as well as the overall Denver metro area. In order to promote the Kia brand and their respective dealerships, both dealerships advertise extensively through broadcast media, print media, digital marketing, e-commerce websites, directories, direct mail, and other forms of advertising.

46.     Arapahoe Kia and Peak Kia currently meet all of KMA's performance standards.

47.     Arapahoe Kia and Peak Kia have made and will continue to make permanent and substantial investments representing KMA in the Relevant Market Area. This includes, but is not limited to, constructing and upgrading facilities at a substantial cost to both businesses.

48.     Arapahoe Kia and Peak Kia made considerable investments into their respective Kia dealerships in reliance upon the reasonable assumption that KMA would not undercut their investments and goodwill. KMA's intended action in establishing the Proposed Dealership at 1290 S. Colorado Blvd. in Denver, threatens to divert Arapahoe Kia's and Peak Kia's established and potential customers, including those within their respective Areas of Primary Responsibility, to a newly created Kia dealership within 10 miles of their locations.

49.     The opening of the Proposed Dealership will be unfair and inequitable to Arapahoe Kia and Peak Kia.

50.     Arapahoe Kia and Peak Kia will suffer adverse economic consequences by the addition of the Proposed Dealership by KMA. Both dealerships are in close proximity to each other and engage in healthy competition with one another for sales and service within the area of the Proposed Dealership. This healthy competition produces benefits to consumers in the form of lower prices and higher quality service KMA's plan to insert a third competitor into this area would upset the balance, likely replacing two healthy competitors with three weak ones.

51.     Accordingly, allowing KMA to open the Proposed Dealership will adversely affect Arapahoe Kia and Peak Kia's financial interests and will not be in the public interest.

### FIRST CLAIM FOR RELIEF
### (Violation of C.R.S. § 44-20-125: Injunctive Relief)

52.     Arapahoe Kia and Peak Kia incorporate all the previous paragraphs as fully set forth herein.

53. Pursuant to C.R.S. § 44-20-125(5), as existing motor vehicle dealers adversely impacted by the Proposed Dealership, Arapahoe Kia and Peak Kia are entitled to bring an action to prevent or otherwise enjoin the establishment of the Proposed Dealership.

54. Establishment of the Proposed Dealership will adversely affect Arapahoe Kia and Peak Kia because both dealerships are located within the statutorily defined Relevant Market Area of the Proposed Dealership.

55. Establishment of the Proposed Dealership will be unfair and inequitable to Arapahoe Kia and Peak Kia, and therefore is not permissible pursuant to C.R.S. § 44-20-125(5)(e)(I).

56. Establishment of the Proposed Dealership is contrary to the public interest, and therefore not permissible pursuant to C.R.S. § 44-20-125(5)(e)(I).

57. Pursuant to C.R.S. § 44-20-125(5)(e)(II), the District Court must deny the establishment of the new dealership unless KMA shows by a preponderance of the evidence that Arapahoe Kia and Peak Kia are not providing adequate representation in the Relevant Market Area.

58. Arapahoe Kia and Peak more than adequately represent KMA in the Relevant Market Area.

59. An authorized and established Kia franchised dealer within a recognized Area of Primary Responsibility is unique.

60. Money damages are an inadequate remedy for ensuring Arapahoe Kia and Peak Kia remain protected from the unlawful approval and establishment of the Proposed Dealership within the geographic areas from which they draw a significant portion of their sales and service customers.

61. As a direct and proximate result of KMA's violation, Arapahoe Kia and Peak Kia suffer and will continue to suffer irreparable injuries, damages, and losses.

62. There is no plain, speedy, and adequate remedy at law to prevent the risk of immediate and irreparable harm to Arapahoe Kia and Peak Kia.

63. The unlawful conduct of KMA may only be prevented through injunctive relief. The grant of injunctive relief will not disserve the public interest, and the balance of equities favor the entry of injunctive relief.

64. Accordingly, Arapahoe Kia and Peak Kia request, and are entitled to, injunctive relief as set forth in C.R.S. § 44-20-125 restraining KMA from approving and establishing the Proposed Dealership.

## SECOND CLAIM FOR RELIEF
### (Violation of C.R.S. § 44-20-125: Damages)

65. Arapahoe Kia and Peak Kia incorporate all the previous paragraphs as fully set forth herein.

66. Pursuant to C.R.S. § 44-20-124(1)(h), it is "unlawful" and a violation of Colorado law for a manufacturer to violate any duty imposed by or fail to comply with any provisions of C.R.S. § 44-20-125.

67. C.R.S. § 44-21-131 provides licensees with a private right of action against vehicle manufacturers for violations of C.R.S. § 44-20-124(1), including the recovery of reasonable attorney fees and costs.

68. Arapahoe Kia and Peak Kia are licensed motor vehicle dealers.

69. As set forth herein, KMA's attempt to establish the Proposed Dealership violates C.R.S. § 44-20-125.

70. As a direct and proximate result of KMA's violation, Arapahoe Kia and Peak Kia suffer and will continue to suffer damages, and have suffered and will continue to suffer damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

71. Arapahoe Kia and Peak Kia incorporate all the previous paragraphs as fully set forth herein.

72. In good faith, Arapahoe Kia and Peak Kia entered into Sales and Service Agreements with KMA and expended millions of dollars in order to comply with KMA's policies and procedures and promote Kia products in the their Areas of Primary Responsibility and throughout the metropolitan Denver market.

73. KMA was required to act in good faith and deal fairly with Arapahoe Kia and Peak Kia in evaluating the market and establishing new dealerships.

74. KMA is required to act in good faith and deal fairly with respect to the exercise of its discretion in deciding whether to establish a new dealership within the geographic area from which Arapahoe Kia and Peak Kia draws their customer base.

75. KMA's actions in establishing the Proposed Dealership within ten miles of both Arapahoe Kia and Peak Kia undermines their investments and goodwill by carving up the Kia customer base.

76. KMA is not acting in good faith and not dealing fairly with Arapahoe Kia and Peak Kia.

77. Accordingly, KMA breached the implied covenant of good faith and fair dealing.

78. As a direct and proximate result of KMA's breach of the implied covenant of good faith and fair dealing, Arapahoe Kia and Peak Kia have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, DC Automotive, Inc., d/b/a ARAPAHOE KIA, and SLT GROUP VI, INC. d/b/a PEAK KIA, respectfully request the Court enter judgment in their favor and against Defendant, Kia Motors America, Inc., enjoining the Proposed Dealership, awarding damages in an amount to be proven at trial, awarding all remedies available under C.R.S. 44-20-131(3), and granting further relief as necessary to protect the Plaintiffs' interest.

DATED this 15th day of January 2019.

*(Original signature on file at Fairfield and Woods, P.C.)*
FAIRFIELD AND WOODS, P.C.

*/s/ Craig D. Joyce*
Craig D. Joyce, Atty. Reg. No. 10556
Michael J. Dommermuth, Atty. Reg. No. 14830
Adrian Castro, Atty. Reg. No. 42028
1801 California Street, Suite 2600
Denver, CO 80202
Telephone: (303) 830-2400
Facsimile: (303) 830-1033
E-Mail: cjoyce@fwlaw.com
E-Mail: mdommermuth@fwlaw.com
E-Mail: acastro@fwlaw.com

Plaintiffs' Addresses:

DC Automotive, Inc. d/b/a Arapahoe Kia
9701 E. Arapahoe Road
Centennial, CO 80112

SLT Group VI, Inc. d/b/a Peak Kia
5077 S. Wadsworth Blvd
Littleton, CO 80123