## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00318-PAB-MEH

DC AUTOMOTIVE, INC. d/b/a ARAPAHOE KIA, a Colorado corporation, and
SLT GROUP VI, INC. d/b/a PEAK KIA, a Colorado corporation,

      Plaintiffs,

v.

KIA MOTORS AMERICA, INC., a California corporation,

      Defendant.

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Pursuant to Rules 12(b)(6), 12(d), and 56 of the Federal Rules of Civil Procedure, Defendant Kia Motors America, Inc. ("KMA") respectfully moves for summary judgment dismissing the Complaint, with prejudice, on the ground that there is no genuine dispute as to any material fact and KMA is entitled to judgment as a matter of law.

In this action, two Kia dealers – Plaintiffs DC Automotive, Inc. d/b/a Arapahoe Kia ("Arapahoe") and SLT Group VI, Inc. D/B/A Peak Kia ("Peak") – seek a permanent injunction to prevent KMA from establishing a new Kia dealership (the "Proposed Dealership") at 1260 S. Colorado Boulevard, Denver, CO (the "Proposed Site"). Plaintiffs' first and second claims are brought under C.R.S. § 44-20-125, which (1) provides that a manufacturer may not establish an additional motor vehicle dealer without first providing at least 60 days' notice to all of its franchised dealers within whose "relevant market area" (or "RMA") the new dealer would be

located and (2) gives such a dealer standing to file an action for a determination of whether the additional dealership should be permitted.

At the time that Arapahoe and Peak each entered into a Kia dealer agreement with KMA, C.R.S. § 12-6-120.3(3)(b) (the predecessor to C.R.S. § 44-20-125(4)(b)) defined the RMA as a five-mile radius around each of their dealerships.  Beyond that five-mile radius, the dealer agreements with Arapahoe and Peak gave KMA the "unrestricted" right to appoint additional Kia dealers.  The Proposed Site is more than five miles away from Arapahoe and Peak. Moreover, prior to the appointment of Arapahoe and Peak, KMA had appointed another dealer, Shortline Kia, to serve the market surrounding the Proposed Site, and Shortline operated in that market from 2002 through 2015.  Accordingly, KMA's decision to appoint a new dealer to replace Shortline is consistent with the contractual expectations of Arapahoe and Peak.

In order to claim standing to protest under C.R.S. § 44-20-125, Plaintiffs rely on an August 9, 2017 statutory amendment expanding the RMA from five to 10 miles (the "2017 RMA Amendment").   Under Colorado law, however, statutory amendments are presumed not to retroactively change the rights of parties to existing contracts unless the legislature clearly expresses an intention for such retroactive application – which it did not do here.

Based on this well-established "presumption of nonretroactivity," the Sixth Circuit rejected a similar attempt by a Kia dealer to claim standing under a statutory RMA amendment in *Kia Motors America, Inc. v. Glassman Oldsmobile Hyundai, Inc.*, 706 F.3d 733, 739-41 (6th Cir. 2013).  While *Glassman* was decided under Michigan law, the presumption of nonretroactivity is equally as strong (if not stronger) in Colorado.  Moreover, even if the legislature had expressed an intention for retroactive application, applying the enlarged RMA to

\\NY - 029013/001262 - 9712121 v4

the contractual relationship between KMA and either of the Plaintiffs would violate the provisions of the Colorado Constitution prohibiting "retrospective" legislation and the "Contracts Clauses" of the Colorado and U.S. Constitutions.

In their second claim, Plaintiffs seek damages for KMA's alleged violation of § 44-20-125. KMA, however, has not violated that statute. KMA has merely given notice under § 44-20-125 that it intends to establish a new dealership, but that dealership has not yet been established. It is not a violation of § 44-20-125 simply to send out the notice that may be required by § 44-20-125. Accordingly, the Court should grant summary judgment dismissing Plaintiffs' first and second claims, both of which are brought under C.R.S. § 44-20-125.

Plaintiffs' third and final claim seeks damages for KMA's alleged breach of the "implied covenant of good faith and fair dealing" by deciding to establish the Proposed Dealership. Summary judgment should be granted as to this claim because the implied covenant does not apply to the type of decision made by KMA, and it cannot be used to contradict the terms of the parties' contracts. Moreover, given Shortline's presence in the market from 2002 to 2015, any claim that KMA's appointment of a dealer to replace Shortline is contrary to Plaintiffs' contractual expectations is baseless.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      KMA is the North American distributor of the Kia line of vehicles.  Compl., ¶ 8.

2.      From in or about May 2002 through on or about June 2, 2015, there was a Kia dealer named Shortline Kia operating on Havana St. in Aurora, Colorado. Declaration of Greg Grulikowski, dated February 25, 2019, ¶¶ 4-6_("Grulikowski Decl.").

3.      Peak was appointed as a Kia dealer on or about August 28, 2003.  Grulikowski Decl., ¶ 7; *see* Compl., ¶ 10.

4.      Arapahoe was appointed as a Kia dealer on or about November 21, 2008.  Grulikowski Decl., ¶ 8; *see* Compl., ¶ 9.

5.      At the time of its appointment, Peak and Arapahoe each signed a Kia Dealer Sales and Service Agreement (the "Dealer Agreement").  Compl., ¶ 11; Grulikowski Decl., ¶¶ 7-8 and Exs. 4 ("Peak Dealer Agreement") and 5 ("Arapahoe Dealer Agreement").

6.      The Dealer Agreement contains Standard Provisions referring to KMA as "COMPANY" and to the Kia dealer as "DEALER."  Grulikowski Decl., ¶ 3 and Ex. 1; *see* Compl., ¶¶ 12-13 (quoting from Standard Provisions).

7.      Article I of the Standard Provisions provides in part that KMA "expressly reserves the unrestricted right . . . to grant others the right to sell Kia Products, whether or not in competition with DEALER."  Grulikowski Decl., Ex. 1, page 5.

8.      Article VII.A of the Standard Provisions provides in part that "DEALER is not being granted an exclusive right to sell Kia Products in any specified geographic area."  *Id*., p. 6.

9.      Article IX.B.1. of the Standard Provisions provides in part that:  "As permitted by applicable law, COMPANY may add new dealers to, relocate dealers into or remove dealers from the [Area of Primary Responsibility] assigned to DEALER."  *Id*., p. 13.

10.     On October 19, 2018, KMA submitted letters to Arapahoe and Peak notifying each of them of KMA's intent to appoint the Proposed Dealership at the Proposed Site.  Compl., ¶ 30; Grulikowski Decl., Exs. 7 and 8.

4

11.     Both Arapahoe and Peak are more than five miles away from the Proposed Site. Complaint, ¶ 34.

12.     The Proposed Site is not in the Area of Primary Responsibility assigned by KMA to either Arapahoe or Peak.  Grulikowski Decl., ¶ 12.

## LEGISLATIVE AND PROCEDURAL BACKGROUND

C.R.S. § 44-20-125 is part of the Colorado Dealer Act (the "Act") and is the type of provision generally known as an "RMA" or "anti-encroachment" statute.  The statute (1) requires a franchisor who proposes to appoint a new dealer to give notice to any same-brand dealer in a statutorily-defined "relevant market area"; and (2) gives any dealer in the RMA the right to seek a determination, based on a host of statutory factors, whether the proposed additional dealership should be permitted.  *See* C.R.S. § 44-20-125(1), (5).  While the RMA statute is not an absolute bar to addition of the dealer, "add-point" protests such as this one are extremely expensive and cause extensive delays.  *See Yamaha Motor Corp. v. Jim's Motorcycle, Inc*., 401 F.3d 560, 571-72 (4th Cir. 2005) (statute creating statewide RMA imposed an undue burden on interstate commerce because even meritless protests can take "years to resolve" and "[m]anufacturers incur significant costs, measured in both money and effort, in defending against [such] protests").

The RMA statute does not grant any right to the public or to the government to object to the proposed location of a motor vehicle dealership.  To the contrary, it merely grants private rights of action to certain dealers to file protests under the statute.  It is entirely within the power of the dealers granted standing to waive or settle any potential claim.  Thus, it is not a form of general regulation of dealership locations, but rather a regulation of the contract rights between two private market participants, car manufacturers and car dealers.

\\NY - 029013/001262 - 9712121 v4

At the time each Plaintiff entered into its Kia Dealer Agreement, and up through August 9, 2017, the Dealer Act provided for a five-mile RMA.  During that period, the statutory predecessor to § 44-20-125 defined the RMA as the "greater" of (1) "the geographic area of responsibility defined in the franchise agreement of the existing dealer" or (2) a radius of five miles around an existing dealer in a county with a population of more than 150,000 or ten miles in a county with a population 150,000 or less.  C.R.S. § 12-6-120.3(3)(b) (2016).  Since Arapahoe and Peak are both located in Arapahoe County, each had a five-mile statutory RMA at the time it entered into its contractual relationship with KMA.

In the 2017 RMA Amendment, the legislature changed the second part of the RMA definition to a ten-mile radius regardless of population density.  S.B. 17-298, § 2 (amending C.R.S. § 120-6-120.3(3)(b)(II)).  This provision was later re-codified as C.R.S. § 44-20-125(3)(b)(II).  *See* S.B. 18-030 (effective Oct. 1, 2018).

Arapahoe and Peak allege that they have standing to sue under § 44-20-125 because the Proposed Site is within their respective RMAs.  *See* Compl., ¶ 54.  Both Plaintiffs admit, however, that they are more than five miles away from the Proposed Site. Compl., ¶ 34.[1]  While KMA sent each of Arapahoe and Peak a notice complying with § 44-20-125, it did so with a full reservation of rights.  Each of the notices states:  "By sending this letter, KMA does not concede that the current version of [§ 44-20-125] applies with respect to your dealership.  KMA hereby reserves all of its rights, including the right to argue that the 2017 amendment does not apply and that, as a result, your dealership lacks standing to protest the intended appointment of Proposed Dealer."  Grulikowski Decl., Exs. 7 and 8.

---

[1]  Arapahoe claims that it is 5.2 miles away from the Proposed Site.  *Id.*  The actual distance is approximately 7.6 miles.  This dispute, however, is not material.

## LEGAL STANDARD

A party may respond to a complaint by filing a motion under Rule 12 and may include matters outside the pleadings; if such matters are considered, the motion must be treated as one for summary judgment under Rule 56.  Fed. R. Civ. P. 12(b)(6), (d).  Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

## ARGUMENT

### I.      Plaintiffs Do Not Have Standing Under C.R.S. § 44-20-125

Plaintiffs would have standing to assert the First and Second Claims for Relief only if the 2017 RMA Amendment were intended to alter the rights and obligations of pre-existing dealer agreements.  Based on the presumption of nonretroactivity, the 2017 RMA Amendment should not be construed to alter those rights.  Moreover, even if such an interpretation were possible, it would be barred by the U.S. and Colorado Constitutions.

#### A.      The 2017 RMA Amendment Does Not Apply

Courts have long refused to give retroactive effect to new legislation, absent a clear indication of a contrary legislative intent.  As the Supreme Court has noted, this "presumption against retroactive legislation" is "deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic."  *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994).  The presumption is founded on "[e]lementary considerations of fairness" – particularly the notion that "settled expectations should not be lightly disrupted."  *Landgraf*, 511 U.S. at 265.

Colorado has strongly embraced the presumption against retroactivity.  Indeed, Colorado is one of a small minority of states whose Constitution, unlike the U.S. Constitution, contains an

\\NY - 029013/001262 - 9712121 v4

express prohibition against any law that is "retrospective in its operation."  Colo. Const., Art. II, § 11; *see Ficarra v. Dep't of Regulatory Agencies*, 849 P.2d 6, 11-12 & n. 11-12 (1993).[2]  In Colorado, the presumption of nonretroactivity is also codified.  C.R.S. § 2-4-202 ("A statute is presumed to be prospective in its operation.")

Under Colorado law, a statute is applied retroactively "<u>when it operates on</u> transactions that have already occurred or <u>rights and obligations that existed before its effective date</u>."  *Ficarra*, 849 P.2d at 11 (emphasis added).  In determining what those rights are, "[t]he Colorado courts have held that the rights of contracting parties are to be determined by the law in force at the time the contract is written."  *General Motors Corp. v. Blevins*, 144 F. Supp. 381, 400 (D. Colo. 1956) (three-judge court); *see Coffman v. State Farm Mut. Ins. Co.*, 884 P.2d 275, 279-81 (Colo. 1994) (law on date of contract governs enforceability of contract provision).

At the time KMA entered into contracts with Peak (2003) and Arapahoe (2008), and through the effective date of S.B. 17-298 (August 9, 2017), KMA had a contractual right to establish Kia dealerships in addition to Arapahoe and Peak, limited only by their statutory protest rights in the five-mile RMA around each dealership.  *See Kia Motors America, Inc. v. Glassman Oldsmobile Hyundai, Inc.*, 706 F.3d 733, 740-41 (6th Cir. 2013) (construing Kia Dealer Agreement). Thus, applying the 2017 RMA Amendment to enlarge Arapahoe's and Peak's protest areas to a 10-mile radius would constitute a retroactive application of the statute. *See Blevins*, 144 F. Supp. at 398-400 (provisions of original Colorado Dealer Act prohibiting

---

[2] The Colorado Supreme Court "mark[s] th[e] distinction" between constitutional and unconstitutional retroactive legislation "by using the term *retrospective* to apply only to legislation whose retroactive effect violates the constitutional prohibition." *Id.* at 12.

manufacturers from terminating or failing to renew dealer agreements held to have "no application to contracts existing at the time of its enactment").

The conclusion that a statute enlarging the RMA should be presumed not to apply to a dealer whose dealer agreement predates the statute's enactment appears to be supported by every case that has considered the issue. *See Glassman,* 706 F.3d at 739-41 (Michigan law enlarging RMA from six miles to nine miles); *LaFontaine Saline, Inc. v. Chrysler Group, LLC*, 852 N.W.2d 78 (Mich. 2014) (same; "A manufacturer-dealer relationship, absent contrary language in the contract, incorporates the relevant market area in effect at the time the dealer agreement was entered."); *Ace Cycle World, Inc. v. American Honda Motor Co.*, 788 F.2d 1225, 1228 (7th Cir. 1986) (Illinois law) (change of RMA definition from area described in agreement to such area or a 10-mile radius, whichever is greater); *In re Kerry Ford, Inc.*, 666 N.E.2d 1157, 1160-61 (Ohio Ct. App. 1995) (Ohio RMA statute does not apply to pre-existing dealer agreements).

Similarly, the majority of courts have held, based on the presumption of nonretroactivity, that statutes and amendments affecting rights and obligations under motor vehicle dealer agreements generally do not apply to agreements that predate their enactment. *See*, *e.g.*, *Blevins*, 144 F. Supp. at 400 (Colorado statute termination provisions); *Chrysler Motors Corp. v. Thomas Auto Co., Inc.*, 939 F.2d 538, 541-43 (8th Cir. 1991) (Arkansas statute prohibiting manufacturer from terminating dealer agreement without "due cause"); *Miller Auto. Corp. v. Jaguar Land Rover N. Am., LLC,* No. 09-1291, 2010 WL 3417975, at *7 (D. Conn. Aug. 25, 2010) (statute restricting manufacturer's right to reject dealer's request to relocate), *aff'd on other grounds*, 471 Fed. App'x 37 (2d Cir. 2012); *McAleer Buick-Pontiac Co. v. General Motors Corp.*, 95 Ill. App. 3d 111, 419 N.E.2d 608 (1981) (statute prohibiting failure to renew dealer agreement without

9

good cause); *Nissan N. Am., Inc. v. Royal Nissan, Inc.*, 794 So. 2d 45, 48 (La. Ct. App. 2001)

(statute giving dealer notice and protest rights concerning changes to its assigned territory);

*Hein-Werner Corp. v. Jackson Indus., Inc.*, 306 N.E.2d 440, 443 (Mass. 1974) (entire dealer act);

*Dale Baker Oldsmobile v. Fiat Motors of N. Am.*, 794 F.2d 213, 220 (6th Cir. 1986) (Michigan

amendment requiring manufacturer to provide post-termination benefits to dealer); *Joe Dwyer,*

*Inc. v. Jaguar Cars, Inc.*, 167 Mich. App. 672, 684, 423 N.W.2d 311, 316 (Mich. Ct. App. 1988)

(per curiam) (same); *Bill Call Ford v. Ford Motor Co.*, 830 F. Supp. 1034, 1040-44 (N. D. Ohio

1993) (statute restricting manufacturer's right to reject proposed transfer of franchise); *Clifford*

*Jacobs Motors, Inc. v. Chrysler Corp.*, 357 F. Supp. 564, 572 (S.D. Ohio 1973) (statute

prohibiting termination without just cause); *Scuncio Motors v. Subaru of New England, Inc.,* 715

F.2d 10, 13 (1st Cir. 1983) (Rhode Island amendment restricting manufacturer's right to require

expansion of dealer's facilities); *Northwood AMC Corp. v American Motors Corp.*, 423 A.2d

846, 849 (Vt. 1980) (statute requiring manufacturer to pay dealer its retail rates for parts used in

warranty repairs); *Buggs v. Ford Motor Co.*, 113 F.2d 618, 621 (7th Cir. 1940) (Wisconsin

statute prohibiting termination that is unfair and without due regard to the equities and just

provocation); *see generally Arapahoe Motors, Inc. v. General Motors Corp.*, No. 99 N 1985,

2001 WL 36400171, at *12-13 (D. Colo. Mar. 28, 2001) (presumption of nonretroactivity applies

to 2000 amendments to Act).

As in all of the above jurisdictions, in Colorado the legislature may "override" the

presumption of nonretroactivity "by clearly expressing a contrary intent." *People v. Summers*,

208 P.3d 251, 256 (Colo. 2009). Here, however, the legislature did not clearly express any intent

that the enlargement of the RMA should alter the rights and obligations of manufacturers and

\\NY - 029013/001262 - 9712121 v4

dealers under pre-existing dealer agreements.  S.B. 17-298 merely states that "[t]his act applies to acts committed on or after the applicable effective date of this act."  S.B. 17-298, § 12(2).  This is standard statutory language indicating that the statute is intended to apply prospectively only.  *See Summers*, 208 P.3d at 257 (collecting cases involving statutes with similar language indicating prospective-only application).

Moreover, the reference to "acts committed" on or after the effective date of the statute is presumably a reference to the "unlawful acts" addressed in Section 1 of S.B. 17-298.  When its object is an "act," the verb "commit" normally refers to an "offense."  *See* Miriam Webster New Collegiate Dictionary at 231 (10th ed. 1997).  KMA has not "committed" any "act" prohibited by S.B. 17-298; to the contrary, it has issued the notice that would be required by Section 2 of S.B. 17-298 if it were deemed to enlarge Plaintiffs' RMAs.

The statutory text, a venerable canon of construction, and the overwhelming weight of judicial authority all point in the same direction:  the 2017 RMA Amendment should be construed to apply only to agreements executed after the amendment's effective date.

### B.        Retroactive Application Would Violate the Colorado and U.S. Constitutions

There is another reason to apply the 2017 RMA Amendment prospectively only – i.e., "[t]he fact that retroactive application would raise a significant constitutional question."  *Glassman*, 706 F.3d at 741; *see Scuncio Motors*, 715 F.2d at 13 (same); *Buggs,* 113 F.2d at 621 (same).  For even if the legislature had clearly expressed an intention that the amendment be applied retroactively, such application would violate (1) the Contracts Clauses of the U.S. and Colorado Constitutions and (2) the Colorado Constitution's ban on retrospective legislation.

\\NY - 029013/001262 - 9712121 v4

1.      **<u>Contracts Clause.</u>**      Both Constitutions prohibit state laws impairing the obligations of contracts.  U.S. Const. art. I, § 10; Colo. Const., art. II, § 11.  These prohibitions will be addressed in tandem.  *See In Re Estate of Dewitt*, 504 P.3d 849, 858-60 (Colo. 2002).

The threshold inquiry in any Contracts Clause challenge is "whether the change in state law has 'operated as a substantial impairment of a contractual relationship.'"  *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)).  "In considering the extent of the impairment, [the Court is] to consider whether the industry the complaining party has entered has been regulated in the past."  *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983).

Application of the 2017 RMA Amendment would substantially impair KMA's contractual rights to "grant others the right to sell Kia Products, whether or not in competition with" Arapahoe and/or Peak.  Grulikowski Decl., Ex. 1, Art. I, p. 5.  It would quadruple the size of each Plaintiffs' protest area, increasing it from 78.54 square miles to 314.16 square miles – an increase of 235 square miles apiece.[3]  Colorado enacted its RMA statute in 2000, prior to KMA's appointment of Shortline (2002), Peak (2003) and Arapahoe (2008) to serve the Denver market.  H.B. 00-1186, § 2 (adding § 12-6-120.3).  KMA had no reason to foresee that the legislature would discontinue basing the size of the RMA on population density and thereby deprive KMA and its customers of Kia's existing level of representation in the Denver market.  Indeed, when the legislature amended the statute in 2010 to define a "right of first refusal area" as a radius around a previous location of a terminated, canceled, or unrenewed dealer, it preserved the five-mile/10-mile distinction between urban and rural areas.  H.B. 10-1049, § 3.

---

[3]  An RMA is a circle.  The area of a circle is the radius squared times 3.1416.  Here, $5 \times 5 \times 3.1416 = 78.54$, and $10 \times 10 \times 3.1416 = 314.16$.

\\NY - 029013/001262 - 9712121 v4

In *Equipment Mfrs. Inst. v. Janklow*, 136 F. Supp. 2d 991 (D.S.D. 2001), *aff'd in part and rev'd in part on other ground*s, 300 F.3d 842 (8th Cir. 2002), the district court held that amendments to a dealer statute granting existing dealers the right to protest the appointment of new dealers constituted a substantial impairment and were "void as they apply to contracts that were in existence before the effective date of the [amendment]." *Id.* at 1000.   On appeal, the Eighth Circuit held that amendments to the statute's termination provisions (which the district court had upheld based on prior regulation) violated the Contracts Clause as well.   300 F.3d at 854-62.  (The District Court's ruling on the RMA provisions was not appealed.  *Id*. at 852 n.8.)

"If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem."  *Energy Reserves Group*, 559 U.S. at 411-12.   The law must protect "a broad societal interest rather than a narrow class." *Allied Structural Steel*, 438 U.S. at 249. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Group*, 459 U.S. at 412.  As shown above, the 2017 RMA Amendment simply protects a "narrow class" and a "special interest" – i.e., it enhances the rights of car dealers against their manufacturers.   Indeed, the title of S.B. 17-298 is "An Act Concerning the Relationship Between a Motor Vehicle Manufacturer and the Motor Vehicle Dealers That Have Franchise Agreements with the Manufacturer."   While the typical justification for such statutes is the "unequal bargaining power" between manufacturers and dealers, "leveling the playing field between contracting parties is expressly prohibited as a significant and legitimate public interest" for Contracts Clause purposes.  *Janklow*, 300 F.3d at 861 (citing *Allied Structural Steel*, 438 U.S.

13

at 247); *see Reliable Tractor, Inc. v. John Deere Constr. & Forestry Co.*, 376 Fed. App'x 938 (11th Cir. 2010) (statute requiring good cause to terminate dealer agreement unconstitutional as applied to pre-existing dealer agreements); *Rutherford Farmers Coop. v. MTD Consumer Group, Inc.*, 124 Fed. App'x 918 (6th Cir. 2005) (statute requiring manufacturer to repurchase dealer's inventory upon termination unconstitutional as applied to pre-existing dealer agreements).

Not only would application of the 2017 RMA Amendment not be justified by any "public" purpose, but using it to delay or block KMA's attempt to restore representation in the market previously served by Shortline would actually undermine one of the stated public interest justifications for the Act – i.e., "the expectancy that dealer will remain in business to provide service for the motor vehicle purchased." C.R.S. § 44-20-101(1)(a) (Legislative Declaration).

2.  **"Retrospective" Legislation.**  Article II, § 11 of the Colorado Constitution also "prohibits the General Assembly from passing laws that are 'retrospective' in their operation." *Taylor Morrison of Colorado, Inc. v. Bemas Constr., Inc.* 411 P.3d 72, 76 (Colo. App. 2014). "A law is unconstitutionally retrospective if it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Id.* (quoting *Abromeit v. Denver Career Servs. Bd.*, 140 P.3d 44, 51 (Colo. App. 2005).

Application of the 2017 RMA Amendment would take away or impair KMA's vested rights under its Dealer Agreements with Arapahoe and Peak to establish additional dealerships. Contract rights may qualify as "vested" rights. *Taylor Morrison*, 411 P.3d at 77; *City of Golden v. Parker*, 138 P.3d 285, 292-93 (Colo. 2006). In determining whether such a right is "vested," the Colorado courts consider "(1) whether the public interest is advanced or retarded, (2) whether

14

the statute at issue gives effect to or defeats the bona fide intentions or reasonable expectations of the affected party, and (3) whether the statute surprises those who have relied on contrary law." *City of Golden*, 138 P.3d at 290.  Once it is determined that retroactive application would impair a vested right, that impairment "may be balanced against public health and safety concerns, the state's police power to regulate certain practices, and other public policy considerations. Retroactive application of a law that implicates a vested right is only permissible, however, if the law bears a rational relationship to a legitimate government interest." *Id.* (citations omitted).

As shown above with respect to the Contracts Clause, the public interest factors in the balancing test do not outweigh KMA's vested contractual right to appoint additional Kia dealers beyond the five-mile radius.  *Cf. Taylor Morrison,* 411 P.3d at 77-79 (statute invalidating contractual limitations of liability with respect to residential construction was unconstitutionally retroactive as applied to contract predating statute); *City of Golden v. Parker,* 138 P.3d at 289-96 (amendment to city charter requiring voter approval to grant certain subsidies unconstitutionally impaired developers' vested contractual right to have city council exercise its discretion annually in the appropriation of city funds to the developers); *Kuhn v. State*, 924 P.2d 1053, 1058-60 (Colo. 1996) (unconstitutional to apply statute limiting the amount of attorney's fees that could be awarded in class actions against public entities where attorneys had obtained a ruling in plaintiffs' favor prior to enactment of law, even though both class certification and award of attorney's fees occurred only after enactment of the statute).

Because the 2017 RMA Amendment should not be construed to apply retroactively, and because it would be unconstitutional if it were, the First and Second Claims for Relief should be dismissed for lack of standing to protest under C.R.S. § 44-20-125.

**II.     KMA Has Not Violated C.R.S. § 44-20-125**

The Second Claim for Relief should be dismissed for an additional, independent reason. That claim is brought under C.R.S. § 44-20-131(3), which grants a dealer who "suffers any loss or damage because of a violation of section 44-20-124(1)" the right to sue for damages. *See* Compl., ¶¶ 66-67. Section 44-20-124(1)(h), in turn, makes it unlawful "[t]o violate any duty imposed by, or fail to comply with, any provision of section 44-20-125 . . . ."

KMA has not violated any duty imposed by, or failed to comply with, § 44-20-125. That section provides (in pertinent part) that a manufacturer may not "establish an additional motor vehicle dealer" without providing notice. KMA has provided the notice specified in § 44-20-125(1) and has not yet "established" the Proposed Dealership.

Plaintiffs allege that "KMA's <u>attempt</u> to establish the Proposed Dealership violates C.R.S. § 44-20-125." Compl., ¶ 69 (emphasis added). Section 44-20-124(1)(h), however, does not make it unlawful for a manufacturer to "attempt" to establish an additional dealership by following the procedure set forth in § 44-20-125. Moreover, it would be an odd (and likely unconstitutional) statute that makes a person liable in damages for complying with its terms.

**III.     The "Implied Covenant" Claim Has No Merit**

Plaintiffs' Third (and final) Claim for Relief is that KMA has breached or will breach the covenant of good faith and fair dealing implied in the Dealer Agreement "in establishing the Proposed Dealership within ten miles of both Arapahoe Kia and Peak Kia." Compl., ¶ 75. This claim has no merit because the implied covenant (1) applies only to the discretionary power of a contracting party to later set "open performance terms" in the contract; (2) cannot be used to

16

contradict the terms of the contract; and (3) applies only to protect the reasonable expectations of the parties at the time of contracting. Plaintiffs' claim violates all three of these principles.

Under Colorado law, "[t]he covenant may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party. However, it will not contradict terms or conditions for which a party has bargained." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) (citations omitted). The type of discretion to which the covenant applies is very specific: it "'refers to one party's power after contract formation to set or control the terms of performance.' Discretion occurs when the parties, at formation, defer a decision regarding performance terms of the contract." *Id.* (citations omitted). As examples of this type of discretion, the Colorado Supreme Court cited a party's power to set "quantity, price or time [of performance]." *Id.*

When this type of discretion is exercised, the covenant operates to protect the justified expectations of the parties. *Id.*; *ADT Security Servs., Inc. v. Premier Home Protection, Inc.*, 181 P.3d 288, 293 (Colo. App. 2007). "A party's justified expectations are violated if evidence indicates it would not have signed the contract had it known of the manner in which the party given discretion would exercise its discretion to determine open terms under a contract." *Id.*

This covenant does not apply to exercises of contract rights such as KMA's "unrestricted right" to appoint additional dealers. *Cf. Ward v. Siebel Living Trust*, 365 Fed. App'x 984 (10th Cir. Feb. 22, 2010) (property owner's exercise of contractual right to terminate broker, thereby depriving broker of a commission for subsequent sale to a purchaser he procured); *Kaspryzk v. PNC Bank, N. A.*, No. 13-CV-00247, 2013 WL 3895069, at *2 (D. Colo. July 29, 2013) (bank's decision to exercise foreclosure remedy).

17

Moreover, the parties did not "defer a decision" at contract formation concerning KMA's rights to appoint additional Kia dealers; rather, the contract specifically sets forth those rights. Plaintiffs are attempting to use the covenant to contradict and undo those rights, a purpose for which it can "never" be used. *Genova v. Banner Health*, 734 F.3d 1095, 1103 (10th Cir. 2013) (Gorsuch, J.) (the implied covenant "never insinuates itself in the first place in ways and places that undo the parties' expressly bargained-for rights"); *see, e.g.*, *Grossman v. Columbine Medical Group, Inc.*, 12 P. 3d 269, 271 (Colo. App. 1999) (contract right to terminate for any reason).[4]

Finally, neither Plaintiff can claim that "it would not have signed the contract had it known" that KMA would appoint another dealer in the market because Shortline was already a dealer in the market at the time that each Plaintiff signed its Dealer Agreement. *See ADT*, 181 P.2d at 294 (where dealer agreement initially provided for a "variable" installation fee of $200, dealer did not have a "justified expectation" that the fee would decrease below $200 based on manufacturer's reduced costs).

In short, Plaintiffs' "implied covenant" claim fails as a matter of law.

---

[4]  In *Mike Naughton Ford, Inc. v. Ford Motor Co.*, 862 F. Supp. 264 (D. Colo. 1994), the court granted summary judgment against two dealers' claims that Ford breached the implied covenant by deciding to establish a dealer within 10 miles of their dealerships. While the court appeared to assume that the implied covenant applied to Ford's decision, (1) the case was decided before *Amoco*; (2) unlike the Kia Dealer Agreement, the Ford agreement did not give Ford the unrestricted right to appoint additional dealers but instead prohibited Ford from adding a dealer within 10 miles unless Ford conducted a study that demonstrated, in Ford's opinion, that the dealership was necessary for proper representation; and (3) the court held that, since the contract permitted Ford to add a dealership based on its own "opinion," the provision "cannot support a claim for breach of the duty of good faith and fair dealing" and that to permit such a claim would be to "rewrite" the contract. *Id*. at 272.

## CONCLUSION

For all of the foregoing reasons, KMA respectfully requests that its motion for summary

judgment be granted and that the Complaint be dismissed with prejudice.

Dated this 27th day of February, 2019.

> HOGAN LOVELLS US LLP
> */s/ John J. Sullivan*
> John J. Sullivan
> 875 Third Avenue
> New York, NY 10022
> Telephone: (212) 918-3000
> Facsimile:  (212) 918-3100
> john.sullivan@hoganlovells.com
>
> Jessica Black Livingston
> HOGAN LOVELLS US LLP
> 1601 Wewatta Street, Suite 900
> Denver, CO 80202
> Telephone: (303) 899-7300
> Facsimile:  (303) 899-7333
> jessica.livingston@hoganlovells.com
>
> *Attorneys for Defendant Kia Motors America, Inc.*

\\NY - 029013/001262 - 9712121 v4