**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00318-PAB-MEH

DC AUTOMOTIVE, INC. d/b/a ARAPAHOE KIA, a Colorado corporation, and
SLT GROUP VI, INC. d/b/a PEAK KIA, a Colorado corporation,

    Plaintiffs,

v.

KIA MOTORS AMERICA, INC., a California corporation,

    Defendant.

---

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

DC Automotive, Inc. d/b/a Arapahoe Kia and SLT Group VI, Inc. d/b/a Peak Kia (collectively Plaintiffs), by and through their counsel, Fairfield and Woods, P.C., hereby respond to the Motion for Summary Judgment ("Motion") filed by Defendant Kia Motors America, Inc. ("KMA"), and state as follows:

**INTRODUCTION**

Plaintiffs filed this action pursuant to C.R.S. § 44-20-125 ("Section 125") to challenge KMA's intent to establish a new dealership within ten miles of their existing dealerships. Section 125 was amended in 2017 to increase the radius within which an existing dealer has a right to challenge the establishment of a new dealership from five miles to ten miles. KMA argues the amendment does not apply because the dealership agreements between KMA and Plaintiffs were entered before the amendment and the proposed new dealership is more than five miles from Plaintiffs' dealerships. However, C.R.S. § 44-20-101(e) provides that all sections of

Article 20 of Title 44 (regarding Motor Vehicle Dealers) ("the Article") are applicable to all dealer agreements—regardless of the date of the dealer agreement.[1]

Retroactive application of Section 125 does not violate the contracts clauses of the U.S. or Colorado constitutions. Section 125 does not impair a vested right of KMA because it is foreseeable that in a highly regulated industry such as the motor vehicle dealer industry the Colorado legislature would increase the radius within which an existing dealership could challenge the establishment of a new dealership, as numerous other states have. One contractual right KMA claims is impaired, *i.e.*, the right to establish new dealerships, is expressly limited by the requirement that it can only be exercised "[a]s permitted by applicable law." Section 125 as it exists now is such an applicable law.

In addition, the legislature's action is reasonably related to legitimate public policies. For similar reasons, Section 125 is not impermissibly "retrospective" under the Colorado constitution.

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is also viable. KMA had the discretion to establish another broker in the area, as addressed in the dealer agreements but left location to KMA's discretion. Thus, KMA has a duty of good faith and fair dealing regarding the establishment of another dealership.

## RESPONSE TO STATEMENT OF FACTS

For purposes of this Response, Plaintiffs do not challenge Defendant's Statement of Undisputed Facts.

---

[1] C.R.S. § 44-20-132 (1)(b) requires application of Colorado law, both substantively and procedurally.

# ARGUMENT

1. **SECTION 125 IS RETROACTIVE.**

A law is presumed to be prospective unless there is a clear legislative intent to apply it retroactively. *See City of Golden v. Parker*, 138 P.3d 285, 290 (Colo. 2006). However, express language of retroactive application is not necessary to find that a law is intended to apply retroactively. *See Ficarra v. Dep't of Regulatory Agencies, Div. of Ins.*, 849 P.2d 6, 14 (Colo. 1993). As the Colorado Supreme Court explained, "for legislation to be given retroactive effect without being unconstitutional, it must be clearly the intent of the General Assembly to do so, but that intent need not be explicitly expressed in the legislation." *Shell W. E&P v. Dolores Cty. Bd. of Comm'rs*, 948 P.2d 1002, 1012 (Colo. 1997).

Here, the General Assembly unambiguously expressed its intent that the entire Article applies to all dealer agreements, regardless of their date. C.R.S. § 44-20-101(e) states, "Subject to the United States constitution and the Colorado constitution, this article 20 applies to each sales, service and parts agreement in effect, regardless of when the agreement was adopted." "Sales, service, and parts agreement" is defined as "an agreement between a manufacturer, distributor, or manufacturer representative and a motor vehicle or powersports dealer authorizing the dealer to sell and service a line-make of motor or powersports vehicles…" C.R.S. § 44-20-102(24). The Dealer Sales and Service Agreements at issue here are sales, service, and parts agreements. *See* Complaint, Exhibit A. By clearly stating in section 101(e) that the Article applies to all sales, service and parts agreements—regardless of the date of the agreement—the legislature clearly expressed its intent that the Article, including the statute, would apply retroactively.

It is true that the bill enacting Section 125 states that it applies to "acts committed on or after the applicable effective date." *See* Motion, at 11 (quoting SB17-298). However, "there is a presumption that all laws are passed with knowledge of those already existing." *Ficarra*, at 13 (quoting *City and County of Denver v. Rinker*, 366 P.2d 548, 550 [1961]). Further, "[a] court does not interpret clauses in isolation, but rather in the broader context of the statute as a whole to give consistent, harmonious and sensible effect to all of its parts." *Hickman v. Catholic Health Initiatives*, 328 P.3d 266, 270 (Colo. App. 2013) (internal quotation marks and ellipsis omitted).

The plain language of section 101(e) applies the entire Article to dealer agreements regardless of the date of the agreement. The bill by which that section was enacted has no language to the contrary. *See* SB13-265 ("**Exhibit A**")). "[I]f statutory language is plain and its meaning clear, it must be applied as written." *Hickman*, at 269.

In *Ficarra*, the Supreme Court found it significant that the legislature did not alter certain language that might have made the law prospective only. *See Ficarra*, at 13. If the legislature had intended Section 125 to apply only prospectively, it would have clearly stated that section 101(e) does not apply to Section 125.

In *Hill v. DeWitt (In re Estate of DeWitt)*, 54 P.3d 849, 856 (Colo. 2002) (upholding amendments to the probate code providing that beneficiaries of life insurance policies would cease to be beneficiaries upon dissolution of marriages), the amendment in question included a statement that "[e]xcept as provided elsewhere in this code and except as provided otherwise in this section…" With this language, the legislature indicated that some parts of the statute were to apply retroactively and some were not. Here, section 101(e) expressly states that the entire Article applies to all dealership agreements, regardless of their dates. Had the legislature intended Section 125 to

4

apply only prospectively, it would have said so, as it did in the amendments to the probate code considered by *DeWitt*.

Based on this, it is clear the Colorado General Assembly intended the *entire* Article to apply to *all* dealer agreements regardless of the date of the agreement. This makes perfect sense because the Colorado legislature, like the legislatures of every other state of which Plaintiffs are aware, has chosen to carefully regulate the auto dealer industry. The Colorado legislature has explained the reasons why such regulation is necessary:

> (1) The general assembly hereby declares that:
>
> **(a)** The sale and distribution of motor vehicles affects the public interest, and a significant factor of inducement in making a sale of a motor vehicle is the trust and confidence of the purchaser in the retail dealer from whom the purchase is made and the expectancy that the dealer will remain in business to provide service for the motor vehicle purchased;
>
> **(b)** Proper motor vehicle service is important to highway safety and the manufacturers and distributors of motor vehicles have an obligation to the public not to terminate or refuse to continue their franchise agreements with retail dealers unless the manufacturer or distributor has first established good cause for termination or noncontinuance of the agreement, to the end that there shall be no diminution of locally available service;
>
> **(c)** The licensing and supervision of motor vehicle dealers by the motor vehicle dealer board are necessary for the protection of consumers, and therefore, the sale of motor vehicles by unlicensed dealers or salespersons, or by licensed dealers or salespersons who have demonstrated unfitness, should be prevented;
>
> **(d)** Consumer education concerning the rules of the motor vehicle industry, the considerations when purchasing a motor vehicle, and the role, functions, and actions of the motor vehicle dealer board are necessary for the protection of the public and for maintaining the trust and confidence of the public in the motor vehicle dealer board; and
>
> **(e)** Subject to the United States constitution and the Colorado constitution, this article 20 applies to each sales, service, and parts agreement in effect, regardless of when the agreement was adopted.

C.R.S. § 44-20-101. Clearly, the Colorado legislature views the sale, use and service of motor vehicles as a matter of great importance. Contrary to KMA's argument, the legislature's reasoning was not simply to protect dealers. The declaration above focuses on the interests of those who purchase and operate motor vehicles, including the protection of consumers, safe operation and use of motor vehicles, and service of motor vehicles. Requiring all manufacturers and dealers to comply with the *current* laws governing motor vehicle dealers, regardless of when they entered into their dealer agreements, serves these purposes.

2. **SECTION 125 DOES NOT VIOLATE THE CONTRACTS CLAUSES OF THE U.S. OR COLORADO CONSTITUTIONS.**

Once it is determined the legislature intended a retroactive effect, the Court "must next decide whether the statute, as applied, violates the constitutional prohibition or is retrospective." *Shell W. E&P v. Dolores Cty. Bd. of Comm'rs*, 948 P.2d 1002, 1012 (Colo. 1997).

A retroactive statute is not *per se* unlawful. As the Colorado Supreme Court has explained, "some retroactively applied civil legislation is constitutional, and some is not, and it is helpful to mark this distinction by using the term *retrospective* to apply only to legislation whose retroactive effect violates the constitutional prohibition." *Ficarra*, at 12 (emphasis in original).

a. **Retroactive application of Section 125 does not violate the contracts clauses of the U.S. or Colorado constitutions.**

Because the federal and state constitutions are essentially the same, they will be addressed together. *See DeWitt*, at 858; *Justus v. State*, 336 P.3d 202, 208 (Colo. 2014).

The contracts clauses are not absolute. *Id.*; *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. 400, 410 (1983). To determine whether a statute violates the contracts clauses, the court must consider "whether the change in state law has operated as a substantial impairment of a

contractual relationship." *Id.*; *Justus,* at 208; *accord Energy Reserves Group*, at 411. "To prove substantial impairment of a contractual relationship, a party must demonstrate that the law was not foreseeable and thus disrupts the parties' expectations." *Dewitt*, at 858; *accord Energy Reserves Group*, at 411. "Additionally, courts should consider whether the statute in question touches on an area that has historically been regulated by the legislature; if so, the statute is less likely to be found to violate the contract clause." *Dewitt*, at 858.

Even if a statute impairs a contract, it should be upheld if "it is reasonable and appropriately serves a significant and legitimate public purpose when considered against the severity of the contractual impairment." *DeWitt* at 858.

In *DeWitt*, the Colorado Supreme Court upheld amendments to the probate code which provided that upon dissolution of marriage the spouse would not be a beneficiary of a life insurance policy unless the decedent expressed a contrary intent. *See id.* at 852. The Court first held the statute was retroactive because the language of the statute made it clear. *See id.* at 855-56.

The Court rejected the argument that this violated the contracts clauses. *See id.* It held that the retroactive amendment did not violate the clauses because the insurance industry and probate code are both highly regulated. *See id.*, at 860. Therefore, the Court held it was foreseeable that the legislature would amend the probate code.[2] The Court explained, "This factor is an important one in assessing a contract clause claim." *Id.* The Court followed the U.S. Supreme Court:

> Because the contract clause is not an absolute bar to legislative regulation of contracts, the Supreme Court has explained that a sliding scale of sorts is appropriate when assessing whether the impairment of contract violates the contract clause: The severity

---

[2] The Court also relied on the "unique nature" of life insurance policies. *Id.*, at 859. That aspect is not present here, but it does not detract from the Court's reasoning regarding foreseeability and heavily regulated industries, upon which, as discussed above, it also relied.

7

>of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at the first stage.

*Id.* (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245, [1978]) (internal quotation marks omitted). "The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at the first stage." *Id*.

Here, similarly, there was no substantial impairment of a contract right. Section 125 increased the radius from five to ten miles. It did not grant a new right to dealers and it did not substantially expand the rights of dealers. Nor does the amendment seek to punish KMA for an act that had occurred prior to its enactment. *See City of Colo. Springs v. Powell*, 156 P.3d 461, 465 (Colo. 2007) (noting that a statute is considered retrospective in order to "prevent the unfairness that would otherwise result from changing the consequences of an act after that act has occurred.") The amendment to Section 125 simply increased the territory in a way that was foreseeable, consistent with the trends in other states, and appropriate considering the strict regulation of the motor vehicle dealer industry in Colorado.

Furthermore, as pointed out by the Defendant, the prior version of the statute already applied a 10-mile radius under certain circumstances, specifically in counties with a population 150,000 or less. C.R.S. § 12-6-120.3(3)(b) (2016)." Motion, at 6. As such, Defendant cannot assert that the amendment increasing the radius to 10 miles for all circumstances was unforeseeable or surprising.

The dealer agreements between plaintiffs and KMA acknowledge the external framework that the law imposes on their contractual relationship, and anticipates that the law may change during the course of their relationship. One of the principal contractual rights that KMA asserts the new law impairs is the right to "add new dealers." That right, however, is limited by this language:

"As permitted by applicable law."[3] Other sections of the dealer agreements also acknowledge that the contractual relationship is subject to "applicable law" and that the laws may in the future change.[4]

The history of Colorado's regulation of motor vehicle franchise agreements also speaks to the foreseeability of the recent statutory amendment. As detailed in *Mike Naughton Ford, Inc. v. Ford Motor Co.*, an earlier provision regulating franchise agreements was struck down in 1956 for being impermissibly vague. 862 F. Supp. 264, 271 (D. Colo. 1994) (discussing *General Motors Corp. v. Blevins*, 144 F. Supp. 381 (D. Colo. 1956)). Despite this, the legislature continued regulating the relationship between motor vehicle manufacturers and dealers, which did not change even after a similar provision was struck down in *Mike Naughton Ford, Inc.* A prior version of C.R.S. § 12-6-120 would later be struck down, but it was already amended during the course of that litigation to address the issue. *See Arapahoe Motors, Inc. v. GMC*, Civil Action No. 99 N 1985, 2001 U.S. Dist. LEXIS 24533, at *40 (D. Colo. Mar. 27, 2001) (striking prior version of statute as vague, but noting legislative amendments had already been made addressing the issue). For decades Colorado's legislature has clearly focused on protecting dealers from abusive manufacturer practices, and as such it should have been foreseeable to

---

[3] *See* Defendant's Undisputed Fact No. 9.

[4] *See, e.g.*, IX, sec. 11 – contemplates future changes in the laws governing safety and emissions equipment with which the parties must comply; XII.C.3 – for giving notice KMA "will grant DEALER such period of time as may be required by law to correct such failure. . .; XII.C.3 "any laws or regulations relating to the sale or service of Kia Products"; XVI.K "any applicable law"; and XVI.L "in the event of material change in applicable law." All of these sections may be found in the dealer agreement attached to the Complaint as Exhibit A.

KMA that Colorado could choose to extend dealer protest rights to 10 miles for all circumstances, rather than just rural dealerships.

*Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892 (7th Cir. 1998), is particularly instructive. There, the Seventh Circuit rejected an argument that the Wisconsin dealer statute violated the contract clause by retroactively enacting a law that allowed a dealer to challenge a manufacturer's denial of permission, under the dealership agreement, to relocate its dealership. "Of great, and we are inclined to say controlling, importance in the determination of whether a law violates the contracts clause is the foreseeability of the law when the original contract was made; for what was foreseeable then will have been taken into account in the negotiations over the terms of the contract." *Id*. at 894-95. The Seventh Circuit went on to explain that the auto dealer industry is highly regulated and no one should have been surprised that the legislature enacted a provision of this sort. *See id*., at 895. The auto dealer industry in Wisconsin, like Colorado, has been regulated for more than 60 years. *See id*. In Colorado, motor vehicle dealers have been regulated by statute since 1938. The applicable laws have been amended, repealed, struck down, and reenacted since that time. *See e.g.* SB 18-030 (relocating and revising the entire Motor Vehicle Dealer code). Colorado courts have repeatedly upheld retroactive legislation of highly regulated industries. *See, e.g., DeWitt* (insurance industry); *Hickman v. Catholic Health Initiatives*, 328 P.3d 266, 273 (Colo.App. 2013) (health care industry); *see also Energy Reserves Group v. Kansas Power & Light*, 459 U.S. 400, 413-14 (1983) (oil and gas).

The fact that the industry is highly regulated, alone, is not dispositive. However, in *Kolosso* "[t]he regulation of which it complains was in the direct path of the plausible (though of course not inevitable) evolution of Wisconsin's program for regulating automobile dealership contracts--for

10

often a law is progressively tightened as experience under its original form discloses gaps--and constituted only a small and predictable step along that path." 148 F.3d at 895.

Here, the retroactive amendment to Section 125 was "a small and predictable step along the path" of motor dealer regulation in Colorado. It was foreseeable that the Colorado legislature would increase the radius within which an existing dealer would have a right to challenge a new dealership, especially since prior version of the Statute already permitted for a 10-mile radius with respect to rural dealerships.

KMA cites four cases, which addressed amendments to such statutes in other states. *See* Motion, at 9. Two of those cases (one in 1986 and the other in 1995) address amendments well before the dealership agreements in this case were entered in 2003 and 2008. Other states amended their statutes to increase the territory. *See e.g.* 1999 Ariz. Legis. Serv. Ch. 102 (H.B. 2032), amending AZ ST § 28-4453 (increasing radius from 8 to 10 miles); 2011 N.J. Laws 66, amending N.J.S. A § 56-10:19 (increasing radius to 20 miles).

In addition, the amendment to Section 125 is less significant than the amendment in *Kolosso*. In *Kolosso*, the Wisconsin legislature created a completely new right—to challenge a denial by the manufacturer of a request to relocate. Here, the right to challenge a new dealership has existed for years. The 2017 amendment to Section 125 only increased the territory within which such a right is available. The Seventh Circuit in *Kolosso* concluded,

> Chrysler should have known in 1988 that it did not have a solid right to prevent a dealer from changing the location of the dealership, that it was operating in a grey area of the dealership law, that the law might some day be amended to regulate disputes over relocation specifically, and that if this happened it might not be able to get the amendment struck down under the contracts clause.

*Kolosso*, at 897. Here, similarly, KMA should have known in 2003 and 2008 when it signed the dealership agreements that the Colorado legislature might increase the territory covered by Section 125 and that it was operating in a "grey area" of the law. KMA did not have a vested right to establish a new dealership less than ten miles (but more than five miles) from the existing dealerships.

Even if KMA did have a vested right that was substantially impaired by the 2017 amendment to Section 125, it does not violate the contracts clauses because it "reasonably and appropriately serves a significant and legitimate public purpose when considered against the severity of the contractual impairment." *DeWitt*, at 858. As discussed above, in C.R.S. § 44-20-101, the Colorado legislature clearly expressed its view that issues surrounding the sale, use and service of automobiles are matters of great importance, especially protection of consumers, safe operation and use of motor vehicles and service of motor vehicles. "When the state is not a party to the contract, a court should defer to the legislature's judgment regarding the necessity and reasonableness of the statute, notwithstanding that the statute may impose a financial hardship on the contracting parties." *DeWitt*, at 859 (citing *Hanson*, 200 F. Supp. 2d at 1018 (citing *Chi. Bd. of Realtors, Inc. v. City of Chi.*, 819 F.2d 732, 737 (7th Cir. 1987)). Even if the Court concludes that KMA had a vested right which was substantially impaired, it should defer to the legislature's judgment on these important policies and uphold Section 125's retroactive application.

### b. <u>Section 125 is not retrospective in violation of the Colorado Constitution.</u>

The Colorado constitution prohibits the legislature from enacting a law that is "retrospective in its operation." Colo. Const. Art. II, Section 11. Interpreting this provision, the Colorado Supreme Court has held, "A statute is retrospective if it takes away or impairs vested rights acquired

under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *DeWitt*, at 858.  Retrospectivity analysis consists of two inquiries.  "First, we must consider the 'vested right' prong of retrospectivity."  However, a finding that a statute impairs a vested right must be balanced against the public interest in the statute as long as it bears a rational relationship to the legitimate government interest.  *See id*.

A vested right is one that is not dependent on the common law or statute but instead has an independent existence.  *See People v. D.K.B.*, 843 P.2d 1326, 1331 (Colo. 1993).  To determine whether there is a vested right, courts consider: "(1) whether the public interest is advanced or retarded; (2) whether the statute gives effect to or defeats the bona fide intentions or reasonable expectations of the affected individuals; and (3) whether the statute surprises individuals who have relied on a contrary law." *DeWitt*, at 855.

As with contract clause analysis, the fact that the industry is highly regulated is important. *See Id.* at 857.

KMA argues that retroactive application of Section 125 would substantially impair a vested right it possess under the dealer agreements.  *See* Motion, at 14.  The same facts discussed above regarding the contract clauses apply here and show that KMA had no vested right in the territory which allowed an existing dealer to challenge a new dealer.  In this heavily regulated industry, it is foreseeable that the legislature would increase the radius of the territory of Section 125, especially since the prior version of the Statute already contained a 10-mile restriction for rural dealerships. This is further evidenced by the evolution of auto dealer regulation in Colorado and throughout the country, including amendment of state statutes to increase the territory for challenges by existing dealers.

In addition, the retroactive application of Section 125 bears a rational relationship to legitimate government interests, specifically protection of consumers, protection of dealers, and public safety associated with the use and service of motor vehicles as described in section 101 of the Article.

Colorado is not alone in recognizing and attempting to narrow the economic disparity between motor vehicle manufacturers and dealers that affords manufacturers significantly greater bargaining power over dealers. Other jurisdictions have similarly recognized the "economic imbalance and unequal bargaining power between large automobile manufacturers and local dealership" and taken measures to protect "dealers from unfair termination and other retaliatory and coercive practices." *Stadium Chrysler Jeep, L.L.C. v. DaimlerChrysler Motors Co., Ltd. Liab. Co.*, 324 F. Supp. 2d 587, 594 (D.N.J. 2004) (discussing the reasoning behind the enactment of the federal Automobile Dealer's Day in Court Act). *See also Fireside Nissan v. Fanning*, 30 F.3d 206, 211 (1st Cir. 1994) (noting Rhode Island's statutory "provision covering the establishment of new automobile dealerships, R.I. Gen. Laws § 31-5.1-4.2, is designed to protect existing dealers and consumers from the detrimental effects of aggressive franchising practices by the automobile manufacturers whose efforts to establish excessive competing franchises are considered to be potentially "injurious to the public welfare" if not properly regulated."); *Beck Chevrolet Co., Inc. v. Gen. Motors LLC*, 53 N.E.3d 706, 715 (N.Y. 2016) (noting that as a result of the historical disparity in bargaining power between motor vehicle manufacturers and dealers, the New York "legislature expanded protections for dealers by enacting the Dealer Act in derogation of common-law contract rules, statutorily overriding agreement provisions that were unfair to dealers … [and] thereby sought to affirmatively

14

"establish an equilibrium of bargaining power."); *GMC v. State Motor Vehicle Review Bd.*, 862 N.E.2d 209, 215-16 (Ill. 2007) ("Illinois' Motor Vehicle Franchise Act is comparable to legislation adopted by a number of states designed to protect existing dealers and consumers from the negative impact of aggressive franchising practices by automobile manufacturers whose desires to establish excessive competing franchises are considered to be a potential threat to the public welfare."); *Ford Motor Co. v. Lyons*, 405 N.W.2d 354, 369 (Wis. Ct. App. 1987) ("Section 218.01, Stats., is a remedial statute with a purpose to furnish a motor vehicle dealer with some protection against unfair treatment by a manufacturer. It was enacted in recognition of the long history of abuse of dealers by manufacturers.")

A recent case from the Supreme Court of New Hampshire illustrates this point. *See Deere & Co. v. State*, 130 A.3d 1197 (N.H. 2015). The New Hampshire legislature amended its motor dealer statute to include tractors and similar equipment in the regulatory scheme. Manufacturers of such equipment challenged the statute based on the state and federal contract clauses. *See id*. at 1205. There was no dispute that the statute applied retroactively. *See id*. at 1207. Like the Colorado constitution, the New Hampshire constitution prohibits "retrospective" legislation. *See id*.

The court assumed (without deciding) that the law impaired a vested right, but held that it did not violate the constitution because it was rationally related to a "significant and legitimate public purpose." *See id*. at 1208. The Court examined the purposes of the statute and concluded: "The purpose of SB 126 — to protect equipment dealers and consumers from perceived abusive and oppressive acts by manufacturers — is unquestionably a significant and legitimate public purpose." *Id*. at 1209.

The court distinguished the holding of *Equipment Manufacturers Institute v. Janklow*, 300 F.3d 842, 861 (8th Cir. 2002), also cited by KMA (*see* Motion, at 13), that "leveling the playing field between contracting parties is expressly prohibited as a significant and legitimate public interest." *Id*. (quoting *Janklow* at 861). "*Janklow* is distinguishable because SB 126 has a broader purpose than a simple reallocation of existing contractual rights." The court held that the New Hampshire bill "aspires to protect consumers as well as dealers." *Id*. Here, this is even clearer. Although one purpose of the Article, including Section 125, is to protect dealers, it serves many other purposes including protection of consumers and public safety of use and service of motor vehicles. *See* C.R.S. § 44-20-101.

The New Hampshire Supreme Court also concluded that the statute was a method of accomplishing the public purpose. The court pointed out that "when the contracts at issue are private and no appreciable danger exists that the governmental entity is using its regulatory power to profiteer or otherwise serve its own pecuniary interests … a court properly may defer to the legislature's judgment." *Id*., at 1212 (quoting *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. 400, 412-13 [1983]). The Colorado Supreme Court has also followed this principle. *See DeWitt*, at 859. The court concluded that the law "plainly survives scrutiny" because it "reasonably accomplishes the legislature's goal of preventing equipment manufacturers from engaging in abusive and oppressive trade practices." *Id*. at 1212-13. The court specifically cited the provision allowing existing dealers to challenge new dealerships within a certain market area as an appropriate regulation to support this purpose. *Id*.

Section 125 is nothing more than one of Colorado's attempts of accomplishing its legislative goals of protecting consumers, ensuring the safe operation and use of motor vehicles, narrowing the

disparity between manufacturers and dealers, and regulating the service of motor vehicles. Since it governs private contract rights, the Court should defer to the legislature on these purposes. *See DeWitt*, at 859. Retroactive application of Section 125 does not violate the Colorado or federal contract clauses, nor is it impermissible retrospective legislation under the Colorado constitution.

3. **DAMAGES**

Given KMA's acknowledgment that it has not yet opened or approved for opening the new Kia dealership at 1260 S. Colorado Blvd., and the Court's order preserving the status quo and preventing KMA from taking such action without first providing Plaintiffs at least 60 days prior notice, Plaintiffs will voluntarily withdraw their second claim for relief without prejudice. Plaintiffs further reserve the right to seek damages under C.R.S. § 44-20-125 if KMA subsequently violates the statute.

4. **DUTY OF GOOD FAITH AND FAIR DEALING**

Under Colorado law, every contract, with some exceptions, contains an implied duty of good faith and fair dealing. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo. 1995). A violation of the duty of good faith and fair dealing gives rise to a claim for breach of contract. *See id.*

The purpose of the doctrine is "to effectuate the intentions of the parties or to honor their reasonable expectations." *Id*. However, the duty of good faith and fair dealing applies only "when the manner of performance under a specific contract term allows for discretion on the part of either party." *Id*. Discretion in performance occurs "when the parties, at formation, defer a decision regarding performance terms of the contract leaving one party with the power to set or control the terms of performance after formation." *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006) (internal quotation marks omitted).

In *Amoco*, the seminal case on this principle in Colorado, the Court held the duty of good faith and fair dealing applied where lease and dealer supply agreements between Amoco and its dealers gave Amoco discretion in calculating the amount of rent. Amoco shifted certain costs to the leased properties, resulting in a substantial increase the amount of rent. *See*, 908 P.2d at 495-96. The jury found Amoco had not exercised its discretion regarding the calculation of rent in good faith and found for the dealers on their breach of contract claim. *See id.* at 497. The court held that because the leases gave Amoco discretion regarding the amount of rent, the duty of good faith and fair dealing applied and the evidence supported the jury verdict. *See id.* at 499.

KMA, however, argues that the duty does not apply where a party has an "unrestricted right" under the contract. *Amoco* does not support that theory. On the contrary, Amoco did have an unrestricted right to calculate the rent. It was just that unrestricted right—the discretion—that generated the duty of good faith and fair dealing. *See Amoco*, at 498.

KMA cites *Ward v. Siebel Living Trust,* 365 Fed. App'x 984 (10th Cir. 2010) (unpublished), for the proposition that the duty does not apply where a party has an "unrestricted right" under the contract. That case, however, is inapposite. There, an exclusive real estate brokerage agreement provided for a "holdover period" (180 days) during which the broker would be entitled to a commission, but only under certain conditions. The broker would not be entitled to a commission if the property owner entered into a listing contract with another broker during the holdover period and the other broker earned a commission pursuant to its listing contract. The plaintiff broker argued the owner had breached the duty of good faith and fair dealing by hiring another broker. The plaintiff broker's contract, however, said nothing whatsoever about whether the owner would hire another broker. Whether the owner hired another broker was *outside* the listing agreement with the

plaintiff. Based on this, the Court held the duty of good faith and fair dealing did not apply to the owner's hiring of another broker.

KMA also cites *Kaspryzk v. PNC Bank*, 2013 U.S. Dist. LEXIS 105901 (D. Colo. July 29, 2013), but that case held the duty of good faith and fair dealing did not apply to a party's decision to enforce a contract that had been breached. The other cases cited by KMA are employment cases. However, "[a]n implied covenant of good faith and fair dealing found in some commercial contracts does not extend to at-will employment contracts." *Farmer v. Cent. Bancorporation, Inc.*, 761 P.2d 220, 222 (Colo. App. 1988).

Here, as in *Amoco*, KMA had the discretion to establish another broker in the area. This was addressed in the dealer agreements but left to KMA's discretion. *See* Motion, p. 4, ¶ 7. Thus, KMA had a duty of good faith and fair dealing regarding the establishment of another dealership. Whether it breached that duty is an issuer for the finder of fact. *See Amoco*, at 499.

## CONCLUSION

For the foregoing reasons, Plaintiffs Arapahoe Kia and Peak Kia respectfully request the Court to deny KMA's Motion for Summary Judgment.

DATED this 20th day of March 2019.

*(Original signature on file at Fairfield and Woods, P.C.)*

FAIRFIELD AND WOODS, P.C.

*/s/ Craig D. Joyce*
Craig D. Joyce, Atty. Reg. No. 10556
Michael J. Dommermuth, Atty. Reg. No. 14830
Adrian Castro, Atty. Reg. No. 42028
1801 California Street, Suite 2600
Denver, CO 80202
Telephone: (303) 830-2400

Facsimile: (303) 830-1033
E-Mail: cjoyce@fwlaw.com
E-Mail: mdommermuth@fwlaw.com
E-Mail: acastro@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of March, 2019 I electronically filed the foregoing **RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

John J. Sullivan
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
john.sullivan@hoganlovells.com

Jessica Black Livingston
Hogan Lovells US LLP
1601 Wewatta Street, Suite 900
Denver, CO 80202
jessica.livingston@hoganlovells.com

*Attorneys for Defendant*

                                          *s/A.J. Jimenez*
                                            A.J. Jimenez