IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 19-cv-00318-PAB-MEH

DC AUTOMOTIVE, INC. d/b/a Arapahoe Kia, a Colorado corporation, and
SLT GROUP VI, INC. d/b/a Peak Kia, a Colorado corporation,

    Plaintiffs,

v.

KIA MOTORS AMERICA, INC., a California corporation,

    Defendant.

# ORDER

This matter comes before the Court on Defendant's Motion for Summary Judgment [Docket No. 21]. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## I. BACKGROUND

This case arises out of a dispute over the potential establishment of a new car dealership in Denver, Colorado.[1] Defendant Kia Motors America is the North American distributor of Kia vehicles. Docket No. 21 at 3, ¶ 1. In this role, defendant appoints entities as dealers, who sell Kia vehicles directly to customers. Plaintiff Peak Kia was appointed as a Kia dealer in 2003; plaintiff Arapahoe Kia was appointed as a Kia dealer in 2008. *Id*. at 4, ¶¶ 3-4. Both plaintiffs signed a standard "Kia Dealer Sales and Service Agreement" (the "dealer agreement") at the time of their appointment. *Id*., ¶ 5. The dealer agreement "expressly reserves" for defendant "the unrestricted right . . . to

---

[1] The parties do not dispute any material facts. *See* Docket No. 23 at 2.

grant others the right to sell Kia [p]roducts," notes that plaintiffs are "not being granted an exclusive right to sell Kia [p]roducts in any specified geographic area," and states that defendant "may add new dealers to, relocate dealers into or remove dealers from" the geographic area "[a]s permitted by applicable law." *Id.*, ¶¶ 7-9. On October 19, 2018, defendant sent letters to plaintiffs, notifying them that defendant intended to appoint a new dealer (the "proposed dealership") at 1260 S. Colorado Boulevard in Denver, Colorado. *Id.*, ¶ 10. Plaintiffs are located more than five miles away from the proposed dealership. *Id.* at 5, ¶ 11.

On January 15, 2019, plaintiffs initiated this lawsuit in the District Court for the City and County of Denver, Colorado. Docket No. 1-2. Plaintiffs allege that defendant's plan to establish the proposed dealership violates Colo. Rev. Stat. § 44-20-125, a statute which creates a private right of action for "[a]n existing motor vehicle dealer adversely affected by" a distributor's plan to reopen, relocate, or establish a "same line-make motor vehicle dealer" to file suit to "prevent or enjoin" the establishment of the proposed motor vehicle dealer. Colo. Rev. Stat. § 44-20-125(5)(a). Plaintiffs bring three claims for relief: (1) injunctive relief for a violation of Colo. Rev. Stat. § 44-20-125, restraining defendant from establishing the proposed dealership; (2) damages for a violation of Colo. Rev. Stat. § 44-20-125; and (3) damages for breach of the implied covenant of good faith and fair dealing. Docket No. 1-2 at 7-10, ¶¶ 52-78. On February 6, 2019, defendant timely removed the case to this Court. Docket No. 1.

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotation marks omitted) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

## III. ANALYSIS

Defendant moves for summary judgment on all three of plaintiffs' claims. Docket No. 21.

### A. Injunctive Relief Under Colo. Rev. Stat. § 44-20-125

Defendant argues that plaintiffs lack "standing" to assert their claim for injunctive relief under Colo. Rev. Stat. § 44-20-125. Docket No. 21 at 7-15.

#### *1. The Statutory Scheme*

The Colorado Dealer Act ("CDA"), Colo. Rev. Stat. § 44-20-101 *et seq.*, regulates the "sale and distribution of motor vehicles" in Colorado, including the relationship between manufacturers, distributors, and dealers of motor vehicles and the general public. Colo. Rev. Stat. § 44-20-101(a). As relevant here, the CDA requires any manufacturer seeking to "establish an additional motor vehicle dealer, reopen a previously existing motor vehicle dealer, or authorize an existing motor vehicle dealer to relocate" to provide at least sixty days notice to all of its existing dealers "within whose relevant market area the new, reopened, or relocated dealer would be located." Colo. Rev. Stat. § 44-20-125(1). Within ninety days of receipt of notice from the manufacturer, an existing dealer who is "adversely affected" by the new dealer may file

4

a legal action or administrative complaint to "prevent or enjoin" the new dealer. *Id*., § 44-20-125(5)(a). An existing dealer is adversely affected if it is "located within the relevant market area" of the new dealer. *Id*., § 44-20-125(5)(a)(I).

Before August 9, 2017, the CDA defined "relevant market area" as the greater of "[t]he geographic area of responsibility defined in the franchise agreement of an existing dealer" and "[t]he geographic area within a radius of five miles of any existing dealer of the same line-make of vehicle that is located in a county with a population of more than [150,000] or within a radius of ten miles . . . in a county with a population of [150,000] or less." *Id*. § 12-6-120.3(3)(b) (2016).[2] Effective August 9, 2017, the statute was amended to define the "relevant market area" as the greater of "[t]he geographic area of responsibility defined in the franchise agreement of an existing dealer" and "[t]he geographic area within a radius of ten miles of any existing dealer of the same line-make of vehicle as the proposed additional motor vehicle dealer." *Id*., § 44-20-125(4)(b) (the "2017 amendment"). Defendant represents, and plaintiffs do not otherwise contend, that plaintiffs are located in counties which have a population in excess of 150,000. *See* Docket No. 21 at 6. In the complaint, plaintiffs represent that they are located more than five miles but less than ten miles from the proposed dealership site. *See* Docket No. 1-2 at 6, ¶ 34. Thus, the effect of the 2017 amendment was to expand the "relevant market area" of both plaintiffs to include the proposed dealership site.

---

[2] The statute was recodified under Title 44 effective October 1, 2018. *See* Senate Bill 18-030.

5

### *2. Effect of the 2017 Amendment*

Defendant argues that retroactive application of the 2017 amendment would violate the Contracts Clause of the United States and Colorado Constitutions and the ban on retroactive legislation in the Colorado Constitution. Docket No. 21 at 11-15.[3] Accordingly, defendant contends that it is entitled to summary judgment because plaintiffs would not have a cause of action but for the 2017 amendment.

#### a. Contracts Clause

The Colorado Constitution provides that "[n]o . . . law impairing the obligation of contracts . . . shall be passed by the general assembly." Colo. Const. art. II, § 11. The United States Constitution states that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. In construing the impairment of contracts clause of the Colorado Constitution, the Colorado Supreme Court has looked to the decisions of the United States Supreme Court interpreting the Contracts Clause of the United States Constitution. *See In re Estate of DeWitt*, 54 P.3d 849, 858-59 (Colo. 2002). Thus, the Court considers defendant's challenge pursuant to the Contracts Clauses of the United States and Colorado Constitutions together.

"The Contracts Clause restricts the power of States to disrupt contractual arrangements." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). "Although the language of the Contract Clause is facially absolute," *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983) (citation omitted), "not all laws affecting

---

[3] In its reply brief, defendant abandons its argument that the presumption against retroactivity applies to § 44-20-125. *See* Docket No. 24 at 2 (noting that, in Colo. Rev. Stat. § 44-20-101(e), the Colorado Legislature expressed its clear intent that amendments would apply retroactively to all dealer agreements).

6

pre-existing contracts violate the [Contract] Clause." *Sveen*, 138 S. Ct. at 1821; *accord*, *DeWitt*, 54 P.3d at 858 (noting that the federal and state contract clauses "are not to be interpreted as absolute" and "must be read to permit legislative action that promotes the common weal, or general good of the public, though contracts previously entered into between individuals may thereby be affected"). Examination of whether a statute violates the Contracts Clause is a two-step inquiry:

> The threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. If a substantial impairment is found, the State, in justification, must have a significant and legitimate public purpose behind the regulation.

*Energy Reserves*, 459 U.S. at 401. "The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978). If legislation constitutes a substantial impairment of a contractual relationship and a significant and legitimate public purpose is identified, "[t]he court then asks whether the change in the law is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Stillman v. Teachers Ins. & Annuity Ass'n Coll. Ret. Equities Fund*, 343 F.3d 1311, 1321 (10th Cir. 2003) (citation, quotation, and alteration marks omitted). "Unless the State itself is a contracting party . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves*, 459 U.S. at 412-13

(citing *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22-23 (1977)) (internal quotation omitted).

The Court turns to the threshold question of whether the 2017 amendment is a substantial impairment of the contractual relationship between plaintiffs and defendant.[4]

In *Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 893 (7th Cir. 1998), the contract between the automobile dealer and the manufacturer forbade the dealer to change the location of the dealership without the manufacturer's written permission. Although Wisconsin law at the time the dealership agreement was signed did not limit the manufacturer's right to include such a clause in the contract, the state subsequently amended its laws to entitle dealers to challenge a manufacturer's refusal to permit a move of the dealership. *Id*. The Seventh Circuit concluded that application of the law to existing contracts did not violate the Contracts Clause. Noting that courts reviewing Contracts Clause challenges emphasized "the degree to which the activity to which the contract pertains was already heavily regulated when the contract was made," Chief Judge Richard A. Posner concluded that the crucial inquiry was "the foreseeability of the law when the original contract was made." *Id*. at 894-95. The *Kolosso* court concluded that the new law was foreseeable, as "[t]he automobile dealership relationship [had] been heavily regulated in Wisconsin . . . for more than sixty years." *Id*. at 895. Observing that "often a law is progressively tightened as experience under

---

[4] Neither party advances the argument that the dealer agreement was intended to incorporate future changes in law such as the 2017 amendment. *See Kia Motors Am., Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*, 706 F.3d 733, 738 (6th Cir. 2013) (finding "no clear indication that . . . the parties intended to incorporate future changes in the law" in the dealer agreement).

8

its original form discloses gaps," the *Kolosso* court held that the new law "was in the direct path of the plausible . . . evolution of Wisconsin's program for regulating automobile dealership contracts" and did not substantially impair the parties' contractual relationship. *Id*. at 895.

Applying *Kolosso*, the Court concludes that the 2017 amendment does not substantially impair the relationship between plaintiffs and defendant because the law was foreseeable. *See Kolosso*, 148 F.3d at 894-95; *see also DeWitt*, 54 P.3d at 858 ("To prove substantial impairment of a contractual relationship, a party must demonstrate that the law was not foreseeable and thus disrupts the parties' expectations."). The relationship between car manufacturers and dealers has been regulated in Colorado for at least sixty years. *See General Motors Corp. v. Blevins*, 144 F. Supp. 381, 385 (D. Colo. 1956) (noting that, in 1955, the Colorado General Assembly amended an already existing statute regulating motor vehicle dealers and manufacturers). As the sale of motor vehicles is an industry "highly regulated by statute in Colorado," changes in the law would have been foreseeable to both parties. *See DeWitt*, 54 P.3d at 860 (holding that, because the insurance industry is highly regulated, changes to laws governing insurance were foreseeable). Moreover, the 2017 amendment is an evolution of the existing CDA. Even before the 2017 amendment, the regulatory scheme allowed dealers to challenge the placement of new dealers within a ten-mile radius in certain counties in Colorado. *See* Colo. Rev. Stat. § 12-6-120.3(3) (2016). Colorado's choice to expand the relevant market area to be ten miles across all counties, as opposed to the previous five-mile or ten-mile relevant market area based

on population, is the sort of "progressive[] tighte[ning]" of a regulatory scheme that the *Kolosso* court found would be foreseeable, as the 2017 amendment further restricts the area in which manufacturers can establish new dealerships without providing notice to already existing dealers. *See Kolosso*, 148 F.3d at 895.

To argue that the 2017 amendment is a substantial impairment, defendant relies on *Equip. Mfrs. Inst. v. Janklow*, 136 F. Supp. 2d 991 (D.S.D. 2001). In *Janklow*, South Dakota revised its law governing the relationship between farm machinery manufacturers and dealers, which previously only imposed restrictions on terminating existing dealerships, to "restrict[] manufacturers' rights to establish new dealerships." *Id*. at 999. The court concluded, without extensive analysis, that this expansion "constitute[d] a substantial impairment of manufacturers' existing contracts," as the existing contracts guaranteed the right to establish new dealerships in certain territory. *Id*. The court went on to conclude that the law did not serve a significant and legitimate public interest. *Id*. However, the history of South Dakota's regulatory scheme, which had never included restrictions on establishing new dealerships before the changes that led to *Janklow*, differs from Colorado's. The CDA already regulated manufacturers' rights to establish new dealerships before the 2017 amendment. *See* Colo. Rev. Stat. § 12-6-120.3(3) (2016). Unlike in *Janklow*, where a manufacturer's right to establish a new dealership was not previously governed by statute, the 2017 amendment is an "evolution" of Colorado's existing scheme for regulating the relationship between dealers and manufactuers. *See Kolosso*, 148 F.3d at 895. Thus, *Janklow* does not persuade the Court that the 2017 amendment operates as a substantial impairment.

Because the 2017 amendment is not a substantial impairment of the contractual relationships between plaintiffs and defendant, the 2017 amendment does not violate the Contracts Clause of either the United States or Colorado Constitutions.

### b. Retrospective Legislation Under Colorado Law

Article II, § 11 of the Colorado Constitution states that "[n]o . . . law . . . retrospective in its operation . . . shall be passed by the general assembly." Colo. Const. art. II, § 11. "Because some retroactively applied legislation is constitutional while some is not, Colorado courts have marked this distinction by evoking the term contained in the constitutional provision – 'retrospective' – to describe a statute whose retroactive application is unconstitutional." *DeWitt*, 54 P.3d at 854. A statute is retrospective under the Colorado Constitution "if it either (1) impairs a vested right, or (2) creates a new obligation, imposes a new duty, or attaches a new disability[.]" *Id.* at 855. Defendant argues that the 2017 amendment impairs a vested right because it has "vested rights under [the dealer agreement with plaintiffs] to establish additional dealerships." Docket No. 21 at 14.[5]

A vested right is one that is "something more than a mere expectation based upon an anticipated continuance of the existing law." *DeWitt*, 54 P.3d at 856 (citing *Ficarra v. Dep't of Regulatory Agencies, Div. of Ins.*, 849 P.2d 6, 16 (Colo. 1993)). A

---

[5] Defendant does not argue that the 2017 amendment creates a new obligation, duty, or disability. *See* Docket No. 21. The Court, therefore, does not address this issue. *Cf. Ficarra v. Dep't of Regulatory Agencies, Div. of Ins.*, 849 P.2d 6, 16 n.16 (Colo. 1993) ("The plaintiffs have not raised on appeal the issue of whether the application of the Act by the Division attaches a new disability to them with respect to transactions or considerations already past. We therefore express no opinion on the issue").

right is vested if it survives "the repeal of a statute or the abrogation of the common law from which [it] may have originated." *Ficarra*, 849 P.2d at 15-16. In other words, "[a] vested right 'must be a contract right, a property right, or a right arising from a transaction in the nature of a contract which has become perfected to the degree that it is not dependent on the continued existence of the statute' or common law." *City of Golden v. Parker*, 138 P.3d 285, 293 (Colo. 2006) (quoting 1A Norman J. Singer, *Sutherland Statutory Construction* § 23.35 (6th ed. 2002)). Retroactive application may be constitutional even if a party is disadvantaged, *People v. D.K.B.*, 843 P.2d 1326, 1332 (Colo. 1993), as there is "a strong presumption in favor of the constitutionality of the legislative action." *Kinterknecht v. Indus. Comm'n*, 485 P.2d 721, 723 (Colo. 1971).

This Court's decision in *Schniedwind v. Am. Fam. Mut. Ins. Co.*, 157 F. Supp. 3d 944 (D. Colo. 2016), is instructive. In *Schniedwind*, the defendant, an insurance company, argued that retrospective application of a change in Colorado law that made contractually-shortened limitations on lawsuits unenforceable infringed on defendant's vested right to shorten the applicable limitations period. *Id*. at 951. The Court disagreed, noting that the purported "vested right" was in fact "dependent on the continued existence of the common law." *Id*. (citing *Parker*, 138 P.3d at 293). The Court observed that, because limitations periods are "inherently the province of the legislature," the defendant had no vested right in the limitations period. *Id*. at 951-52. Here, defendant's purported right to establish the proposed dealership at a certain location is not based on the contract between it and plaintiffs; rather, it relies on the continued existence of the regulatory scheme that places the location of the proposed

12

dealership outside plaintiffs' relevant market area. *See Schniedwind*, 157 F. Supp. 3d at 951. Moreover, regulation of the relationship between car manufacturers and dealers is within the longstanding province of the legislature. *See id*. at 951-52; *General Motors Corp.*, 144 F. Supp. at 385. Because defendant's contractual expectation relied on the continued validity of the regulatory scheme in an area within traditional legislative power, defendant has no vested right to establish the proposed dealership. *See Nye v. Indus. Claim Appeals Office of State of Colo.*, 883 P.2d 607, 609 (Colo. App. 1994) ("[I]n the usual case, no person has a vested right in any rule of law entitling that person to insist it shall remain unchanged for his or her future benefit.").[6]

Application of the 2017 amendment in this case does not violate either the United States or Colorado Constitutions. Therefore, because the proposed dealership

---

[6] In *DeWitt*, the Colorado Supreme Court identified the following factors for determining whether a vested right has been implicated: "(1) whether the public interest is advanced or retarded; (2) whether the statute gives effect to or defeats the bona fide intentions or reasonable expectations of the affected individuals; and (3) whether the statute surprises individuals who have relied on a contrary law." *DeWitt*, 54 P.3d at 855. Defendant suggests that these factors demonstrate that it has a vested right to establish dealerships outside the previous five-mile relevant market area. Docket No. 21 at 15. The Court finds that the public interest is advanced by the legislature's determination that granting each dealer a more expansive relevant market area protects the public's expectancy that a dealer "will remain in business to provide service for the motor vehicle purchased." *See* Colo. Rev. Stat. § 44-20-101(1)(a). Regarding the second and third factors, although defendant may have expected to be able to establish the proposed dealership in reliance on contrary law, the Court finds that, since any surprise is mitigated by the highly regulated nature of the relationship between car manufacturers and dealers, any surprise or frustration of expectation does not outweigh the first factor. As a result, the *DeWitt* factors do not show that defendant has a vested right to establish the proposed dealership.

is within the relevant market area of both plaintiffs, *see* Docket No. 1-2 at 6, ¶ 34, the Court will deny defendant's motion for summary judgment as to plaintiffs' First Claim.

### B.  Damages Under Colo. Rev. Stat. § 44-20-125

Defendant argues that plaintiffs' Second Claim should be dismissed because defendant has not "establish[ed] an additional motor vehicle dealer" without providing notice to plaintiffs.  Docket No. 21 at 16 (quoting Colo. Rev. Stat. § 44-20-125).  In response, plaintiffs indicate that they "voluntarily withdraw" their claim for damages.  Docket No. 23 at 17.  In order to voluntarily withdraw their claim, plaintiffs would need to file a motion to amend the complaint pursuant to Fed. R. Civ. P. 15.  *See, e.g.*, *David A. Bovino P.C. v. MacMillan*, No. 12-cv-00551-PAB-MEH, 2012 WL 6576973, at *1 (D. Colo. Dec. 17, 2012) ("In cases . . . where a plaintiff has attempted to dismiss fewer than all claims against a defendant, courts typically convert the plaintiff's motion into a Rule 15 motion to amend the complaint.").  Plaintiffs have not done so.  *See* D.C.COLO.LCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion.").  As plaintiffs have not moved to amend the complaint, and otherwise do not challenge defendant's motion, the Court will grant summary judgment for defendant on plaintiffs' Second Claim.

### C.  Duty of Good Faith and Fair Dealing

Plaintiffs' Third Claim is that defendant's actions in establishing the proposed dealership is a breach of the implied covenant of good faith and fair dealing.  Docket No. 1-2 at 9-10, ¶¶ 71-78.  "If the cooperation of the other party is necessary for successful performance of an obligation, a promise to give that cooperation and not to

do anything that prevents realization of the fruits of performance will often be implied." 1 Witkin, *Summary of California Law* (11th), Contracts § 822 (2019).[7] "The implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation," and "does not impose substantive terms and conditions beyond those to which the parties actually agreed." *Avidity Partners, LLC v. State of California*, 221 Cal. App. 4th 1180, 1204 (2013). A plaintiff's claim must relate the alleged breach to the express terms or underlying purposes of an identified contract. *Carma Developers (Calif.), Inc. v. Marathon Dev. Calif., Inc.*, 826 P.2d 710, 727-28 (Cal. 1992). "When a court enforces the implied covenant it is in essence acting to protect the interest in having promises performed." *Foley v. Interactive Data Corp.*, 765 P.2d 373, 393-94 (Cal. 1988).

Defendant argues that it is entitled to summary judgment because the implied covenant applies only to the discretionary power of a contracting party to unilaterally determine performance terms in the contract. Docket No. 21 at 16.[8] "[W]hen a contract gives one party a discretionary power affecting the rights of the other, that party must exercise its discretion in good faith and in accordance with fair dealing." *Powerhouse Motorsports Grp., Inc. v. Yamaha Motor Corp., U.S.A.*, 221 Cal. App. 4th 867, 882

---

[7] The parties' briefing proceeds under the assumption that Colorado law governs this claim. However, California substantive law governs the dealer agreement. Docket No. 22-1 at 28, ¶ XIII.D. The duty of good faith and fair dealing in Colorado is substantially similar. *See, e.g., Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995).

[8] Defendant also argues that it is entitled to summary because the implied covenant cannot be used to contradict the terms of the contract and only protects the reasonable expectations of the parties at the time of contracting. Docket No. 21 at 16-17. The Court does not reach these arguments.

(2013); *cf. Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) ("The duty of good faith and fair dealing applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time."). Defendant argues that the implied covenant does not apply to the exercise of its right to appoint additional dealers. Docket No. 21 at 17. In response, plaintiffs argue that defendant's right to appoint additional dealers is the sort of "discretionary power" that triggers the implied covenant; thus, the question of whether it breached the implied covenant is a question of fact. Docket No. 23 at 19.

The Court agrees with defendant. Under the express terms of the dealer agreement, defendant "expressly reserves the unrestricted right . . . to grant others the right to sell [Kias], whether or not in competition with [plaintiffs]," does not grant plaintiffs "an exclusive right to sell [Kias] in any specified geographic area," and "may add new dealers" as permitted by applicable law. *See* Docket No. 22-1 at 7, 8, 15, ¶¶ I, VII.A, IX.B.1. Based on these contractual terms, it is unclear to the Court what the source of an implied covenant of good faith in the establishment of future dealerships would be. It is unclear what promise defendant made to plaintiffs and subsequently failed to perform that the Court would be able to enforce by way of the implied covenant. *See Foley*, 765 P.2d at 393-94. Given the language that defendant "expressly reserve[d] the unrestricted right" to establish potential competitors to plaintiffs, the Court will not hold that the implied covenant now "prohibit[s] [defendant] from doing that which is expressly permitted by an agreement." *See Carma Developers*, 826 P.2d at 728 (noting that "as a general matter, implied terms should never be read to vary express

terms"); *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1032 (1992) (holding that an implied covenant "cannot be extended to create obligations not contemplated in the contract"); *cf. Mike Naughton Ford, Inc. v. Ford Motor Co.*, 862 F. Supp. 264, 272 (D. Colo. 1994) (car manufacturer's intended establishment of a new dealership does not violate the implied covenant where manufacturer complies with the express provisions of the contract with the existing dealership). Plaintiffs thus fail to identify what "specific contractual obligation" defendant's proposed dealership would violate. *See Avidity Partners*, 221 Cal. App. 4th at 1204.

Plaintiffs rely on *Amoco Oil* for support, but that case cannot bear the weight plaintiffs place on it. In *Amoco Oil*, lease agreements between an oil company and service station dealers gave the oil company discretionary authority to "modify" the amount of rent owed by the dealers. 908 P.2d at 498. The Colorado Supreme Court held that, because this discretionary authority "required the dealers to depend upon [the oil company's] good faith," the oil company's discretionary authority was subject to the implied covenant of good faith and fair dealing. *Id*. at 499. The court noted that "[t]he covenant may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party." *Id*. at 498. Accordingly, for plaintiffs here to rely on *Amoco Oil* they need to show that defendant had "discretionary authority" as to "the manner of performance under a specific contract term." Plaintiffs cannot do so, because defendant's decision to establish the proposed dealership is not an exercise of discretion to control a "manner of performance." *See*

*id.* at 498. *Amoco Oil* might apply to the dealer agreement if, for example, defendant had the discretionary authority to set a quota of Kias that plaintiffs would need to sell each month or each year or the dealer agreement would be revoked. *Compare* Docket No. 22-4 at 10 (contract addendum setting a goal of 85 monthly sales for Peak Kia in its first year). Defendant's right to add new dealers, expressly reserved in the dealer agreement, is not connected to the manner of performance under the dealer agreement. Thus, *Amoco Oil* is not on point.

Because defendant's establishment of the proposed dealership does not violate the dealer agreement's implied covenant of good faith and fair dealing, plaintiffs' Third Claim fails and the Court will enter summary judgment for defendant.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 21] is **GRANTED IN PART** and **DENIED IN PART**.

DATED September 3, 2019.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
Chief United States District Judge