IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 19-cv-00318-PAB-MEH

DC AUTOMOTIVE, INC. d/b/a Arapahoe Kia, a Colorado corporation, and
SLT GROUP VI, INC. d/b/a Peak Kia, a Colorado corporation,

       Plaintiffs,

v.

KIA MOTORS AMERICA, INC., a California corporation,[1]

       Defendant.

_____

**ORDER**
_____

       On July 12, 2021 to July 15, 2021, the Court presided over a 4-day bench trial in

this case, which involved plaintiffs' challenge pursuant to Colo. Rev. Stat. § 44-20-125

to defendant's attempt to establish a new Kia dealership in the Denver metropolitan

area.  *See* Docket Nos. 84-87.  Plaintiffs Arapahoe Kia ("Arapahoe") and Peak Kia

("Peak") bring one claim against defendant Kia America, Inc.[2]  Plaintiffs ask the Court to

enjoin defendant from appointing a new Kia dealership at 1260 South Colorado

Boulevard, Denver, Colorado (the "proposed dealership") under Colo. Rev. Stat. § 44-

_____

     [1] Kia Motors America, Inc. changed its name to Kia America, Inc. during the course of the litigation.  Transcript at 4:24 to 5:3.  However, Kia America, Inc. and Kia Motors America, Inc. are the same legal entity, and defendant did not move to amend the case caption.  Accordingly, the Court will maintain the original case caption.

     [2] Plaintiffs' complaint brought three claims: (1) injunctive relief under Colo. Rev. Stat. § 44-20-125; (2) damages under Colo. Rev. Stat. § 44-20-125; and (3) breach of the implied covenant of good faith and fair dealing.  Docket No. 6 at 7-10.  However, the Court granted summary judgment in defendant's favor on the second and third claims. Docket No. 38 at 14, 18.

20-125.  Docket No. 6 at 5, 9 ¶¶ 30, 64.  The Court has jurisdiction under 28 U.S.C. § 1332.

Defendant called four witnesses at the trial: (1) Greg Grulikowski, the director of retail development for defendant; (2) Scott Martin, the regional director of the Southwest Region for defendant; (3) Fred Emich, IV, the general manager of the proposed dealership; and (4) Sharif Farhat, an expert witness.[3]  Plaintiffs called six witnesses: (1) Joseph Roesner, an expert witness; (2) Michael Byerly, the general manager of Peak Kia; (3) William Byerly, an owner of Peak Kia; (4) Donald Hicks, the former owner of Shortline Kia; (5) Beth Maul, the accounting controller for Peak Kia; and (6) Carl Ventsam, an owner of Arapahoe Kia.

## I.  FINDINGS OF FACT

There are two sources of facts: facts to which the parties have stipulated and facts found at trial.

### A.  Stipulated Facts[4]

The parties stipulated to the following facts:

1.  Arapahoe Kia is a franchised Kia dealership located at 9701 East Arapahoe Road, Centennial, Colorado.

2.  Peak Kia is a franchised Kia dealership located at 5077 South Wadsworth

---

[3] Because defendant bears the burden of proof on the majority of the statutory factors, the parties agreed that defendant would present its case first at the trial.

[4] The stipulation is marked as Exhibit 77.  Unless otherwise indicated, all citations to "Exhibit" refer to trial exhibits.  Numerical exhibits are plaintiffs' exhibits; alphabetical exhibits are defendant's exhibits.  The Court has edited some stipulated facts for grammar and syntax, but has not altered the substance of any stipulated facts.

Boulevard, Littleton, Colorado.

3.  Under the laws of Colorado and most other states, only licensed dealers can lawfully sell motor vehicles to consumers, and motor vehicle manufacturers and distributors such as defendant may not obtain dealers' licenses and are prohibited from selling motor vehicles directly to consumers.

4.  Defendant divides the Denver metropolitan into five areas of primary responsibility ("APRs").

5.  Arapahoe Kia is assigned the Denver Southeast APR.

6.  Peak Kia is assigned the Denver South APR.

7.  The Denver North and Denver West APRs are assigned to dealers who are not parties to this action.

8.  The Denver East APR is presently an open point that defendant is trying to fill with the proposed dealership.

9.  The Denver metropolitan area is part of what defendant refers to as District 08, which encompasses Colorado and Wyoming.

10.  District 08 is located in defendant's Southwest Region, which consists of Wyoming, Colorado, New Mexico, Oklahoma, Texas, Arkansas, Louisiana, and Mississippi.

11.  Since 1996, Grand Kia has operated as an authorized Kia dealer at 1950 West 104th Avenue, Thornton, Colorado, in the northern part of the Denver market.

12.  Doug Moreland has been the majority owner of Grand Kia since its inception.

13.  In or about 2001, defendant appointed Osborn Automotive to own and operate a Kia dealership at 8303 West Colfax Avenue in Lakewood, the western part of the Denver market.

14.  In 2009, the Osborn Automotive's name was changed to Larry H. Miller Kia.

15.  In 2013, Larry H. Miller Kia moved to 8275 West Colfax Avenue.

16.  In 2015, Larry H. Miller Kia was sold to Medved Kia, which relocated the dealership to 11201 North I-70 Service Road in Wheat Ridge, where it remains today.

17.  In 2002, defendant appointed Shortline Kia to own and operate a Kia dealership on Havana Street in Aurora.

18.  Shortline Kia continuously operated on Havana Street in Aurora from 2002 through June 1, 2015.

19.  In November 2013, Shortline Kia received a notice of termination from defendant with respect to its Kia dealership.

20.  Shortline Kia filed a protest action in response to defendant's notice of termination.

21.  Shortline Kia ceased operations on June 1, 2015.

22.  On July 21, 2003, Peak Kia purchased a Kia dealership located on 4940 South Broadway, Englewood, Colorado.

23.  In 2003, Peak Kia became an authorized Kia dealer when it signed a Kia Dealer Agreement (the "Peak Kia Dealer Agreement") with defendant.

24.  At the time of its appointment, Peak Kia was located at 4940 South Broadway, Englewood, Colorado.

25. Peak Kia's initial location was approximately 8.4 air miles away from Shortline Kia.

26. The initial owner of Peak Kia was Steve Taylor.

27. Peak Kia was restructured in 2004 to add William Byerly as an owner.

28. In 2005, Peak Kia relocated to a newly constructed facility located at 5057 South Wadsworth Boulevard, Littleton, Colorado.

29. On or about November 1, 2011, Peak Kia relocated to its present location at 5077 South Wadsworth Blvd, Littleton, Colorado.

30. On or about November 21, 2008, Arapahoe Kia became an authorized Kia dealer when it signed a Kia Dealer Agreement (the "Arapahoe Kia Dealer Agreement") to own and operate a Kia dealership at 9400 East Arapahoe Road in Greenwood Village, Colorado.

31. Arapahoe Kia's owners are Doug Moreland and Carl Ventsam.

32. Arapahoe Kia's initial location was approximately 8.6 air miles away from Shortline Kia.

33. From Arapahoe Kia's appointment in December 2008 through June 1, 2015, defendant had five authorized dealers in the Denver metropolitan.

34. On or about November 2013, Arapahoe Kia received a termination notice from defendant.

35. Arapahoe Kia protested the letter of termination.

36. Arapahoe Kia's gallery store became operational on or about September 19, 2017.

37. Kia "gallery" stores are more costly to construct and furnish than a

"core-branded" Kia dealership.

38.  On or about October 19, 2018, defendant gave written notice to Arapahoe Kia and Peak Kia of defendant's intent to appoint the proposed dealership at 1260 South Colorado Boulevard, Denver, Colorado.

39.  The proposed dealership is known as Emich Kia.

40.  The proposed General Manager is Fred Emich, IV.

41.  In February 2018, the proposed dealership, through Fred Emich, IV, submitted an application to defendant to become a Kia franchise.

42.  On July 30, 2018, the proposed dealership entered into a letter of intent ("LOI") with defendant to become a franchised Kia dealer.

43.  On October 2, 2018, the proposed dealership signed an amended LOI with defendant.

44.  The proposed dealership has agreed to renovate the existing facility to comply with defendant's Core Branding Standards.

45.  The proposed dealership is approximately 7.7 air miles away from Arapahoe Kia.

46.  The proposed dealership is approximately 9.3 air miles away from Peak Kia.

47.  The proposed dealership is not in the APR assigned by defendant to either Arapahoe Kia or Peak Kia.

**B.  Findings of Fact from Trial Evidence**

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact:

### 1. All-Wheel Drive in Colorado and Kia's Line-Make

48.   Defendant currently offers the following vehicle models, each of which competes in the segment following its name: Rio (Sub-Compact car); Forte (Compact car); Optima, also know as the K5 (Midsize car); Cadenza (Large car); Stinger (Near Luxury car); Niro (Entry Crossover Utility Vehicle ("CUV")); Soul (Entry CUV); Seltos (Entry CUV); Sportage (Sub-Compact SUV); Sorento (Compact SUV); Carnival (Midsize Multi-Purpose Vehicle ("MPV")); and Telluride (Midsize SUV).   Transcript at 39:21-40:7 (Grulikowski); *see also* Exhibit A-12 at A-11.   During the period of time relevant to this case, defendant also offered the K900, a vehicle in the "Mid-Luxury" segment; this car was no longer manufactured after 2019.   Transcript at 196:2-5 (Grulikowski).   Kia recently introduced an electric vehicle, the EV6, which was projected to be available for consumer delivery in the first quarter of 2022.   *Id.* at 69:5-15 (Grulikowski).

49.   Before 2018, only two Kia vehicles, the Sorento and Sportage, had all-wheel drive ("AWD") options.   *Id.* at 78:4-23 (Grulikowski).   Starting in 2018, Kia began releasing a new AWD model on an almost-yearly basis.   *Id.*   In 2018, Kia released the Stinger.   *Id.*   In 2019, Kia released the Telluride.   *Id.*   In 2020, Kia release the Seltos. *Id.*   In 2021, Kia released the K5.   *Id.*   Each of these vehicles has AWD options.   *Id.*

50.   Drivers in the Denver metropolitan area prefer AWD or 4-wheel drive ("4WD") Kia vehicles at rates significantly higher than the national average.   *Compare* Exhibit 69 at 4-6 (detailing percent of new Kia vehicle registrations with AWD/4WD for 2020 in the Denver metropolitan), *with id.* at 1-3 (the same data for the United States as

a whole).

51.  This not unique to Kia vehicles.  Denver consumers prefer AWD or 4WD vehicles above the national average for other car brands as well.  Transcript at 486:13-487:19 (M. Byerly); *id.* at 581:20-582:2 (Hicks); *id.* at 615:10-616:10 (W. Byerly).

52.  Hyundai is a comparable brand to Kia.  It offers similar line-makes with similar AWD/4WD capabilities.  *Id.* at 280:2-6 (Farhat); *id.* at 436:4-18 (Roesner); *id.* at 66:15-20 (Grulikowski); *id.* at 577:11-578:1 (Hicks); *id.* at 847:23-848:1 (Ventsam).

53.  The median household income of a Kia purchaser is $65,000.  *Id.* at 227:22-23 (Farhat).

54.  Kia as a brand has improved its reputation since 2007 and enjoys stronger brand recognition now than in the past.  *Id.* at 493:13-20 (M. Byerly); *id.* at 37:1-15 (Grulikowski).

### 2. *Availability of Property on Havana Street*

55.  Shortline was located on Havana Street east of the proposed dealership. Mr. Grulikowski testified that it would have been Kia's preference to place the proposed dealership on Havana Street, but defendant was unable to find a location on Havana Street.  *Id.* at 56.

56.  Mr. Emich testified that, when he was investigating the possibility of pursuing a Kia dealership, he looked on Havana Street to see if there was available property as a "contingency" in case he could not reach a deal with the landlord of his 1260 South Colorado Boulevard property.  *Id.* at 144.  Mr. Emich identified a parcel with a "for sale" sign; he attempted to meet with the owner multiple times, but was unsuccessful.  *Id.* at

8

144-45.  Eventually, Mr. Emich's commercial real estate broker informed him that, although there was a "for sale" sign on the property, it was not actually for sale.  *Id.*

57.  Mr. Hicks testified about the same piece of property,[5] *id.* at 587, saying that the parcel has had a "for sale" sign up for over twenty years, but that there "is a deal working on it now" for an automobile dealership.  *Id.* at 587-88.  However, Mr. Hicks did not indicate that the deal had been completed or on what terms.  *See id.* at 588.

58.  The Court finds that there was not available, suitable property on Havana Street for a Kia dealership to replace Shortline.

### 3. Kia Inventory in the Denver Metropolitan Area

59.  The COVID-19 pandemic has impacted vehicle sales generally.  Projections for 2021 vehicle sales, made during the second quarter of 2020, were significantly lower than actual sales for the first half of 2021.  The rebound of the car market was swifter than many manufacturers expected.  This led to vehicle supply shortages for many manufacturers.  *Id.* at 233-34 (Farhat).  A micro-chip shortage resulting from the COVID-19 pandemic led to industry-wide inventory problems.  *Id.* at 70-71 (Grulikowski); *id.* at 423:1-14 (Roesner).  Demand for vehicles during the pandemic has been high and dealers in general are making large profits.  *Id.* at 411:13-14 (Roesner) ("2020 was the best financial year for the vast majority of dealers and I am talking ever.").

60.  Plaintiffs experienced tight inventory before COVID-19, specifically with

---

[5] Mr. Hicks testified that the property was near a Lowe's store while Mr. Emich testified that it was near a Home Depot.  *Compare* Transcript at 587, *with id.* at 144-45. However, there was no disagreement between the parties that the witnesses were speaking about the same parcel of land.

respect to the Telluride. *Id.* at 488:18-490:22 (M. Byerly); *id.* at 618:16-22 (W. Byerly). But high demand for Kia vehicles has also led to tight inventory. *Id.* at 70-71 (Grulikowski). Kia dealerships are currently selling more vehicles per month in the United States than Kia has the manufacturing capacity to produce for that market. *Id.* at 501:20-502:19 (M. Byerly); *id.* at 780:4-19 (Ventsam).

61. Inventory is allocated on a regional basis. There are 109 Kia dealers in the Southwest Region. *Id.* at 72 (Grulikowski). The Court finds that the addition of a dealer in the Denver East APR open point would have a minimal impact on the inventory available to plaintiffs.

62. A dealership earns inventory by selling its existing inventory in a system know as "turn and earn." *Id.* at 505:8-506:14 (M. Byerly). Plaintiffs did not present any evidence of unfairness to them in the allocation system relative to the other Kia dealers in the Denver metropolitan area.

### 4. *Denver Population*

63. Denver has experienced population growth above the national average. The population aged 16 and over in the proposed dealership RMA was 966,097 in 2000; 1,021,021 in 2010; 1,186,647 in 2018; and is projected to be 1,273,442 in 2023. A-12 at A-38. The increase in households for the proposed dealership relevant market area over the same period of time follows a similar trend. *Id.* The trend is similar to trends in each of plaintiffs' APRs. *See id*. at A-36 to A-37.

### 5. *Relationship of Defendant and Plaintiffs*

64. Defendant Kia America, Inc. is the distributor of vehicles, parts, and

accessories for Kia Motors Corporation in the United States.  Transcript at 35:20-22 (Grulikowski).  Kia America has five sales offices in the United States which have direct contact with dealers.  *Id.* at 35:2-6 (Grulikowski).  Kia America appoints dealers with dealer sales and service agreements.  *Id.* at 41:11-15 (Grulikowski).

## II.  CONCLUSIONS OF LAW

### A.  Legal Stipulations[6]

The parties made the following legal stipulations:

1.  This Court has personal jurisdiction over the parties.

2.  Venue is proper in this District.

3.  The parties agree that Colorado law governs the state-law claim at issue here.

4.  Plaintiffs are Colorado citizens.

5.  Defendant is not a Colorado citizen.

6.  Colo. Rev. Stat. § 44-20-125 governs this matter.

7.  The notices defendant gave to plaintiffs on or about October 19, 2018 complied with the requirements of Colo. Rev. Stat. § 44-20-125(1).

8.  Plaintiffs have standing to protest and timely filed this action to prevent or enjoin the establishment of the proposed dealership under Colo. Rev. Stat. § 44-20-125.

---

[6] The stipulation is marked as Exhibit 77.  The Court has edited some legal stipulations for grammar and syntax, but has not altered the substance of any legal stipulations.

### B.  Statutory Framework

The Colorado Dealer Act ("CDA"), Colo. Rev. Stat. § 44-20-101 *et seq*., regulates the "sale and distribution of motor vehicles" in Colorado, including the relationship between manufacturers, distributors, and dealers of motor vehicles and the general public.  Colo. Rev. Stat. § 44-20-101(1)(a).  As relevant here, the CDA requires any manufacturer seeking to "establish an additional motor vehicle dealer, reopen a previously existing motor vehicle dealer, or authorize an existing motor vehicle dealer to relocate" to provide at least sixty days notice to all of its existing dealers "within whose relevant market area the new, reopened, or relocated dealer would be located."  Colo. Rev. Stat. § 44-20-125(1).  Within ninety days of receipt of notice from the manufacturer, an existing dealer who is "adversely affected" by the new dealer may file a legal action or administrative complaint to "prevent or enjoin" the new dealership.  *Id*., § 44-20-125(5)(a).  The parties stipulate that plaintiffs have standing to bring this action.  *See* Exhibit 77 at 5, ¶ 8.

In a case challenging the addition of a dealership, the court "shall make a determination of whether the relocation, reopening, or addition of a motor vehicle dealer is . . . : (A) [i]n the public interest; and (B) [f]air and equitable to the existing motor vehicle dealers."  Colo. Rev. Stat § 44-20-125(5)(e)(I).  In making this determination, the Court considers ten statutory factors, seven of which the manufacturer bears the burden of proof on and three of which the motor vehicle dealer bears the burden of proof on.  *Id.*  Additionally, the Court "shall deny" the addition of a dealership "unless the manufacturer shows by a preponderance of the evidence that the existing motor

vehicle dealer or dealers of the same line-make in the relevant market area of the

proposed dealership are not providing adequate representation of the line-make motor

vehicles." *Id.* § 44-20-125(5)(e)(II).  If a court enjoins a manufacturer from adding a

dealership, that determination is effective "for at least eighteen months."  *Id.*

### C.  Whether the Proposed Dealership is in the Public Interest and Fair and Equitable to the Existing Dealers

The Court must determine whether the proposed dealership is in the public

interest and fair and equitable to the existing dealers.  The Court bases this decision on

the factors in subsections 5(c) and 5(d).  *Id.* § 44-20-125(5)(e)(I).  Those subsections

state:

> (c) In any court or administrative action, the manufacturer has the burden of proof on each of the following issues:
> > (I) The change in population;
> > (II) The relevant vehicle buyer profiles;
> > (III) The relevant historical new motor vehicle registrations for the line-make of vehicles versus the manufacturer's actual competitors in the relevant market area;
> > (IV) Whether the opening of the proposed additional, reopened, or relocated motor vehicle dealer is materially beneficial to the public interest or the consumers in the relevant market area;
> > (V) Whether the motor vehicle dealers of the same line-make in the relevant market area are providing adequate representation and convenient customer care, including the adequacy of sales and service facilities, equipment, parts, and qualified service personnel, for motor vehicles of the same line-make in the relevant market area;
> > (VI) The reasonably expected market penetration of the line-make, given the factors affecting penetration; and
> > (VII) Whether the additional, reopened, or relocated dealership is reasonable and justifiable based on expected economic and market conditions within the relevant market area.
> (d) In any court or administrative action, the motor vehicle dealer has the burden of proof on each of the following issues:
> > (I) Whether the manufacturer has engaged in any action or omission that, directly or indirectly, denied the existing motor

13

vehicle dealer of the same line-make the opportunity for reasonable
growth or market expansion;
(II) Whether the manufacturer has coerced or attempted to coerce
any existing motor vehicle dealer or dealers into consenting to
additional or relocated franchises of the same line-make in the
community or territory or relevant market area; and
(III) The size and permanency of the investment of and obligations
incurred by the existing motor vehicle dealers of the same
line-make located in the relevant market area.

*Id.* § 44-20-125(5).[7]

### 1. Relevant Market Area of Proposed Dealership

As an initial matter, the Court must determine the relevant market area ("RMA")

of the proposed dealership.  The CDA defines RMA as the greater of "(I) The

geographic area of responsibility defined in the franchise agreement of an existing

dealer; or (II) The geographic area within a radius of ten miles of any existing dealer of

the same line-make of vehicle as the proposed additional motor vehicle dealer."  Colo.

Rev. Stat. § 44-20-125(4)(b).  This definition does not speak to the RMA of a proposed,

as compared to an existing, dealership.

Recognizing this ambiguity, defendant submitted evidence relevant to both the

APR to be assigned to the proposed dealer (the Denver East APR) and the 10-mile

radius around the proposed dealership.  Docket No. 89 at 2 n.1.  Plaintiffs, however,

---

[7] An issue running throughout the trial was plaintiffs' objection to the location of
the proposed dealership, rather than the establishment of new dealership in general.
Plaintiffs state that "[t]he Kia brand would be better served by locating a dealership in
other areas of the Denver East APR."  Docket No. 90 at 6; *see also id.* at 7 ("The
Proposed location is not in an ideal location to service the entirety of the Denver East
APR; areas in the eastern and northeastern portion of the APR will see no improved
convenience.").  The Court notes that its job is to evaluate the proposed dealership
based on the statutory factors, not to determine the ideal location for a dealership in the
Denver East APR.

argue that the 10-mile radius is the RMA of the proposed dealership.  Docket No. 90 at 4.  The Court agrees with plaintiffs.  Mr. Farhat testified that the 10-mile radius around the proposed dealership is larger than the Denver East APR.  Transcript at 183:2-6. Because the 10-mile radius is a larger area than the Denver East APR, the Court will consider this to be the proposed dealer's RMA when evaluating the statutory factors. The Court will refer to the 10-mile ring as the proposed dealership RMA.

### 2.  *Factors for Which Defendant Bears the Burden of Proof*

### a.  The change in population

The parties agree that Denver has and is expected to continue to have population growth.  *See* Docket No. 89 at 5-6; Docket No. 90 at 5-7.  Defendant presented evidence of the population trends in the Denver East APR and the proposed dealership RMA.  *See* Exhibit A-12 at A-35, A-38.  This evidence shows strong population growth in the proposed dealership RMA, with a population aged 16 and over of 966,097 in 2000; 1,021,021 in 2010; 1,186,647 in 2018; and 1,273,442 projected f or 2023.  *Id.* at A-38.  The increase in households for the proposed dealership RMA over the same period of time follows a similar trend.  *Id.*  Defendant presented evidence of similar trends in each of plaintiffs' APRs.  *See id.* at A-36 to A-37.

Plaintiffs argue, however, that defendant's evidence of population growth does not take into account *where* the population growth is.  Docket No. 90 at 6.  Specifically, plaintiffs argue that the proposed dealership will favor consumers in central Denver while leaving the consumers in the east and northeast of the Denver East APR under-served.  *Id.* at 6-7.

It is undisputed that the Denver East APR has a growing population and the Court has found that there is not available property on Havana Street for the proposed dealership. *See supra* Section I.B.58. Accordingly, the Court finds that defendant has shown by a preponderance of the evidence that the change in population weighs in favor of the proposed dealership.

### b. The relevant vehicle buyer profiles

The median household income of a Kia purchaser is $65,000. Transcript at 227 (Farhat). Mr. Farhat testified that there is a distribution of households with incomes both below and above the $65,000 mark around the proposed dealership.[8] *Id.* at 228. He testified that it is beneficial to have a "good mix of both levels of income" because people from both groups purchase Kia vehicles. *Id.* at 228:15-24.

Plaintiffs argue that defendant ignores the preference in Denver for AWD vehicles. Docket No. 90 at 8-9. The evidence shows a preference for AWD vehicles in Denver relative to the rest of the country. *See supra* Section I.B.50. However, the preference in Denver for AWD vehicles does not rebut the data showing that the typical Kia vehicle buyer comes from a household earning $65,000. While those households may have a preference for AWD vehicles, plaintiffs do not point to any evidence showing that the median household income of an AWD Kia purchaser differs from that

---

[8] Mr. Farhat's graphs included the distribution of households making $20,000 to $65,000 and $65,000 and up. Exhibit A-12 at A-41. Mr. Farhat excluded households earning less than $20,000 because they represent less than 5% of Kia's sales. Transcript at 227:13-24.

of a two-wheel drive Kia purchaser.[9]  Accordingly, the Court finds that the presence of a

"good mix" of households below and above the median household income of a Kia

purchaser around the proposed dealership weighs in favor of the proposed dealership.

### c.  The relevant historical new motor vehicle registrations for the line-make of vehicles versus the manufacturer's actual competitors in the relevant market area

Defendant argues that it has experienced a substantial decline in registration

effectiveness relative to its competitors following the termination of Shortline.  Docket

No. 89 at 6-7.  Plaintiffs argue that defendant uses an irrelevant benchmark for

historical new motor vehicle registrations.  Docket No. 90 at 10.  Specifically, plaintiffs

argue that defendant includes irrelevant two-wheel drive line-makes.  *Id.*

The proposed dealership RMA has been well below expected registration

effectiveness since 2014 when compared to national, Southwest Region, or Colorado

represented markets less Denver standards.[10]  Exhibit A-12 at A-26.3.  Additionally,

plaintiffs' argument regarding defendant's use of an improper benchmark is undermined

by a comparison of Hyundai and Kia sales.  Hyundai and Kia have similar line-makes.

*See supra* Section I.B.52.  Between 2014 and 2018, Kia sales nationally fluctuated

---

[9] Plaintiffs make no argument that, with the advent of more AWD options in the Kia line, the median household income of a Kia purchaser has changed at all, or if it has, to a degree as to make Mr. Farhat's conclusions on the distributions of household incomes no longer accurate.

[10] Kia only assigns certain portions of the State of Colorado to dealerships as APRs.  Transcript at 176:4-25 to 177:1-3 (Farhat).  There are fourteen Kia APRs in Colorado, five of which are in the Denver metropolitan area.  *See* A-12 at A-2.  The Denver metropolitan area accounts for over half of the Kia sales in Colorado. Transcript at 189:12-14 (Farhat).  The "Colorado represented markets less Denver" benchmark refers to Kia performance in the nine APRs that are not in the Denver metro area.  *See id*. at 190:18-21; 191:18-22 (Farhat).

between 86% and 95% of Hyundai sales.  *See* Exhibit A-15.  During the same time period, however, Kia sales in the Denver metropolitan area were significantly lower than Hyundai's.  For example, for Denver metropolitan area dealerships, 2014 Kia sales were approximately 74% of Hyundai sales, 2015 Kia sales were approximately 57% of Hyundai sales, 2016 Kia sales were approximately 45% of Hyundai sales, 2017 Kia sales were approximately 52% of Hyundai sales, and 2018 Kia sales were approximately 46% of Hyundai sales.[11]  *See id.*

Mr. Roesner agreed with defendant that the difference in sales between Hyundai and Kia could not be explained by AWD biases.  Transcript at 436-37.  The Court finds that the Kia's relevant historical new motor vehicle registrations versus the Kia's competitors in the proposed dealership RMA shows that Kia has been under-represented since the termination of Shortline.  This weighs in favor of the proposed dealership.

### d.  Whether the opening of the proposed additional, reopened, or relocated motor vehicle dealer is materially beneficial to the public interest or the consumers in the relevant market area

Plaintiffs argue that the consumers in central Denver, who are near the proposed dealership, are adequately served by the existing dealers, but the eastern and northeastern portions of the Denver East APR will not be adequately served by the

---

[11] Mr. Farhat performed a similar comparison of Kia to Volkswagen sales in the Denver metropolitan area.  *See* Exhibit A-16.  Mr. Ventsam testified that he believed that Arapahoe Hyundai, the Hyundai dealership next to his Arapahoe Kia dealership, had a greater inventory of Palisades, the Hyundai counterpart to the Telluride.  Transcript at 759:15-22.  However, the data shows that Kia was under-performing compared to Hyundai in the Denver metropolitan area well before the introduction of the Telluride and Palisade in 2019.  *See id.* at 846:8-16 (Ventsam) (stating that Palisade was introduced in 2019).

18

proposed dealership due to its location.  Docket No. 90 at 7-8.

Mr. Farhat presented persuasive evidence that the registrations associated with a dealership decrease the farther away one is from that dealership.  Exhibit A-12 at A-61.  From this, he concluded that consumers buy from closer dealers.  Transcript at 249:4-10.  Currently, the average drive distance to a Kia dealership for a Denver East APR registration is 10.1 miles; most of Kia's competitors have an average drive distance of 5.5 to 6.5 mile range in the Denver East APR.  *Id.* at 250:22-252:14; Exhibit A-12 at A-62.  Adding the proposed dealership would reduce the Denver East APR registration average drive distance to the nearest Kia dealership to 6 miles.  Exhibit A-12 at A-66.  Mr. Roesner, plaintiffs' expert, agreed that, in general, decreasing distance from consumers to a dealership would be a benefit to consumers.  Transcript at 435:9-18.

Customer convenience is served by reducing travel distance to a dealership.  By definition, every consumer in the proposed dealership RMA will be within ten miles of the proposed dealership.  The Court finds that the proposed dealership is materially beneficial to consumers in the proposed dealership RMA.

Increased competition is usually in the public interest.  *See Gallo Motor Ctr. Corp. v. Mazda Motor of Am., Inc.*, 204 F. Supp. 2d 144, 154 (D. Mass. 2002) (noting that increased competition will usually benefit consumers, unless it is to a point that dealers are forced to go out of business or reduce the quality of their services).

Plaintiffs argue that the public interest will not be served if their viability is threatened by competition with the proposed dealership.  Docket No. 90 at 8.  This argument fails for a number of reasons.  First, plaintiffs entered the market with the

19

assumption that there would be five Kia dealers in the Denver metropolitan area.

Second, Mr. Farhat testified persuasively that the number of lost sales in the Denver

metropolitan was sufficient for the proposed dealership to be successful without taking

sales away from plaintiffs.  Transcript at 257:6-265:13; Exhibit A-12 at A-67 to A-73.1.

Plaintiffs' expert, Mr. Roesner, disagreed with this testimony.  *See* Exhibit 67 at 105,

108 (showing Mr. Roesner's calculation of lost profit to Arapahoe Kia and Peak Kia in

2018 if proposed dealership had existed).  However, the Court finds Mr. Roesner's

opinion unpersuasive because (1) he relied on a "fixed-pie" assumption, i.e., that the

addition of the proposed dealership would not grow the base of Kia consumers in

Denver; (2) the Denver metropolitan area has experienced population growth faster

than the rest of the nation; and (3) he provided limited explanation of how he

determined the amount of plaintiffs' loss.  The Court finds that the addition of the

proposed dealership is in the public interest is due to the increased competition it will

generate.

> **e.  Whether the motor vehicle dealers of the same line-make in the relevant market area are providing adequate representation and convenient customer care, including the adequacy of sales and service facilities, equipment, parts, and qualified service personnel, for motor vehicles of the same line-make in the relevant market area**

Plaintiffs sell significant numbers of Kias in the proposed dealership RMA.  *See*

Exhibit 75 at 13.  However, the question is whether they are providing adequate

representation and convenient customer care in the proposed dealership RMA.

Defendant presented evidence in Exhibit A-12 at A-25.3 to A-26.3 that plaintiffs are not

providing adequate representation.  Mr. Farhat testified that Exhibit A-26.3 shows that

registration effectiveness is below average in the proposed dealership RMA no matter what metric you use, and that Kia is performing poorly in the proposed dealership RMA. Transcript at 214.  Exhibit A-12 at A-27.3 additionally shows that the rate of Kia owners[12] in the Denver East APR who visit a dealership for vehicle services is the lowest of any of the APRs in Denver.

Plaintiffs provided evidence of the number of service transactions they perform. *See* Docket No. 90 at 15-16.  Additionally, Arapahoe Kia is a gallery store, which is a larger facility.  The Court finds that defendant has shown that plaintiffs are not providing adequate representation, but have not shown that plaintiffs are providing inadequate customer care.  Accordingly, the Court finds this factor weighs slightly in favor of the proposed dealership.

### f.  The reasonably expected market penetration of the line-make, given the factors affecting penetration

Kia's brand registration effectiveness in the proposed dealership RMA has been below expected from 2014 to March 2021 when compared to the national benchmark, the Southwest Region benchmark, and the Colorado represented markets less Denver benchmark.  Exhibit A-12 at A-26.3.  Plaintiffs argue that defendant is using unreasonable methodology to measure expected market penetration because it does not account for "(1) consumer preference for AWD vehicles, (2) inventory and allocation issues impacting Denver Metro dealers; (3) KMA's historic lack of desirable AWD vehicles; (4) certain unknown factors; and (5) its flawed design around a constantly

---

[12] Mr. Farhat testified that the exhibit only includes Kias that have been in use for seven years at the most, which are the vehicles that Kia owners are more likely to take to the dealership for service.  Transcript at 215.

shifting average."  Docket No. 90 at 14.  Each of these arguments fails with a comparison of penetration in the proposed dealership RMA versus other area dealers.

In Exhibit A-14 at Sup-1, Mr. Farhat compared registration effectiveness in 2018 to various standards.  The exhibit shows that the proposed dealership RMA is only 58.4% registration effectiveness relative to the North Colorado average.[13]  Colorado consumers' preference for AWD relative to the rest of the country cannot account for this difference.  Mr. Roesner's analysis does not contradict Mr. Farhat and, in fact, supports his conclusion.  In Exhibit 67 at page 21, Mr. Roesner contrasts registration effectiveness without incorporating drive type and with incorporating drive type.[14]  The proposed dealership RMA registration effectiveness increases from 57.55% to 101% when drive type is incorporated in Mr. Roesner's analysis.  Exhibit 67 at 21.  However, Peak Kia's registration effectiveness jumps from 86% to 149% under the same analysis.  *Id.*  Because Peak Kia is in the same metropolitan area, none of the reasons provided by plaintiffs can account for the significantly higher registration effectiveness of Peak Kia relative to the proposed dealership RMA.  Defendant has shown, by a preponderance of the evidence, that its brand penetration in the proposed dealership RMA is much lower than expected. This factor therefore weighs in favor of the proposed dealership.

---

[13] The North Colorado average includes the Fort Collins, Greeley, and Longmont APRs.  Transcript at 869:8-11 (Farhat).

[14] Drive type refers to the number of wheels driving, i.e., two-wheel drive versus AWD or 4WD.  Transcript at 375:5-9 (Roesner).

**g.  Whether the additional, reopened, or relocated dealership is reasonable and justifiable based on expected economic and market conditions within the relevant market area**

The Court has already discussed that the population growth in Denver weighs in favor of the proposed dealership.  With five dealers instead of four, the Denver metropolitan area would still be in the top five of expected vehicle registrations per dealer for Colorado and adjacent states.  Exhibit A-12 at A-51.1.  Additionally, as discussed above, Kia has recently introduced more AWD vehicles that appeal to Colorado drivers and its reputation has improved.  Mr. Farhat presented persuasive evidence that there are significant lost sales in the Denver metropolitan area.  Accordingly, the Court finds that the proposed dealership is reasonable and justifiable based on the market conditions in the proposed dealership RMA.

### 3.  Factors on Which Plaintiffs Bear the Burden of Proof

**a.  Whether the manufacturer has engaged in any action or omission that, directly or indirectly, denied the existing motor vehicle dealer of the same line-make the opportunity for reasonable growth or market expansion**

Plaintiffs argue that inventory issues have denied them the reasonable opportunity for growth or expansion.  Docket No. 90 at 19-20.  As noted above, plaintiffs experienced shortages of certain models before the COVID-19 pandemic, notably the Telluride, and the COVID-19 pandemic has only exacerbated these issues.  *See supra* Section I.B.59.  However, the effects from the COVID-19 pandemic micro-chip shortage are industry-wide.  *Id.*  Plaintiffs introduced no evidence that they were treated unfairly in the Kia allocation system relative to the other Denver metropolitan area dealers.  *See supra* Section I.B.62.

Exhibit A-14 at Sup-1 shows why the inventory crunch has not denied plaintiffs a fair opportunity for growth.  Mr. Farhat provided a benchmark of the Denver metropolitan minus the Denver East APR and Arapahoe Kia's APR.  Compared to this benchmark, Peak Kia was at 102.7%, Arapahoe Kia was at 62.8%, and the proposed dealership RMA was at 68.9%.  Exhibit A-14 at Sup-1.  Arapahoe Kia and the proposed dealership RMA were significantly underperforming relative to Peak Kia, and relative to the combination of Peak Kia, Grand Kia, and Medved Kia.  The inventory issues cannot explain this under-performance because plaintiff introduced no evidence that other Denver dealers were treated preferentially.  Even if the Court assumed Grand Kia and Medved Kia received more vehicles, the comparison to Peak Kia shows that the lack of inventory cannot explain the lack of penetration.  Accordingly, the Court finds that inventory issues have not denied plaintiffs the opportunity for reasonable growth and expansion.  This factor weighs against plaintiffs.

### b.  Whether the manufacturer has coerced or attempted to coerce any existing motor vehicle dealer or dealers into consenting to additional or relocated franchises of the same line-make in the community or territory or relevant market area

Plaintiffs provided no evidence regarding coercion, and the Court finds that there has not been coercion.

### c.  The size and permanency of the investment of and obligations incurred by the existing motor vehicle dealers of the same line-make located in the relevant market area

The investment made by plaintiffs, especially Arapahoe Kia's construction of the gallery facility, have been substantial.  *See* Exhibits 12, 16.  The Court finds that this factor weighs in plaintiffs' favor and against the proposed dealership.

24

### 4. Conclusion

Defendant has sustained its burden of proof on six out of seven statutory factors. Plaintiffs have sustained their burden of proof on one out of three statutory factors.  The Court finds, considering these factors individually and as a whole, that the proposed dealership is in the public interest and is fair and equitable to the existing motor vehicles.

### D.  Whether the Existing Dealers are Providing Adequate Representation

For the reasons given above, the Court finds that the existing dealers are not providing adequate representation in the proposed dealership RMA.  Kia has been underperforming as a brand for many years in the Denver metropolitan, the Denver East APR, and the proposed dealership RMA; none of the explanations provided by plaintiffs explain the under-performance.  Kia has a lower share of the "shelf space" in Denver relative to its national average.  Exhibit A-12 at A-52; Transcript at 243:1-20 (Farhat).  To reassign the Denver East APR to Arapahoe Kia would make it the second largest APR in the country, Transcript at 74:4-18 (Grulikowski), when its penetration of its own APR is already significantly below expectation.  The Court finds that the existing dealers are not providing adequate representation.[15]

## III.  CONCLUSION

The Court finds that defendant meets the statutory requirements to establish a new dealership, to be known as Emich Kia with General Manager Fred Emich, IV, at

---

[15] The Court used the 10-mile ring around the proposed dealership as the RMA of the proposed dealership.  However, the Court notes that it would have reached the same conclusion if it had used the Denver East APR instead of the 10-mile ring as the RMA of the proposed dealership.

1260 South Colorado Boulevard, Denver, CO.  For the foregoing reasons, it is

**ORDERED** that judgment shall enter in favor of defendant and against plaintiffs

on plaintiffs' claim for injunctive relief.  It is further

**ORDERED** that this case is closed.


DATED February 23, 2022.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge